FOURTH DIVISION
FILED:  June 14, 2007

No. 1-05-1640

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 03 CR 24690 |
| | ) | |
| TRIANDUS TABB, | ) | Honorable James Egan, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) | |

JUSTICE MURPHY delivered the opinion of the court:

Following a trial by jury, defendant, Triandus Tabb, was convicted of attempted first

degree murder, aggravated battery with a firearm, and aggravated vehicular hijacking.  The trial

court merged the first two convictions and defendant was sentenced to 12 years' imprisonment for

attempted first degree murder and 4 years' imprisonment for aggravated vehicular hijacking.  The

trial court found that defendant had caused great bodily harm to the victim and ordered the

sentences be served consecutively pursuant to section 5-8-4(a) of the Unified Code of

Corrections.  730 ILCS 5/5-8-4(a) (West 2004).

On appeal, defendant contends that: (1) the trial court erred when it granted the State's

motion *in limine*, denying him the opportunity to use witness Norman Brown's juvenile

delinquency adjudication record to impeach the testimony of Brown and Eyvonne Ford; (2) the

trial court erred when it denied his motion for a directed verdict; (3) the State failed to prove him

guilty beyond a reasonable doubt because the State's witnesses were not credible and the identification of defendant as the offender was unreliable; (4) the trial court violated the one-act, one-crime doctrine when it sentenced him for both aggravated battery with a firearm and attempted first degree murder convictions; and (5) the trial court violated the ruling in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), when it, rather than the jury, made a factual finding of "severe bodily injury" and imposed consecutive sentences.

## I. BACKGROUND

On September 6, 2003, at approximately 1:20 p.m, Salvador Gomez (the victim) was in his car and stopped at a red light at the intersection of West 5lst Street and South Ashland Avenue in Chicago, Illinois. While stopped, the victim was attacked and shot at by an armed assailant who had threatened the victim and demanded he get out of his vehicle. Defendant, who lived in the vicinity of the crime at the Daniel J. Nellum Group Home (the group home), was later arrested for the crime.

### The Motion *in Limine*

Before defendant's trial began, the State presented an oral motion *in limine* to bar testimony regarding Norman Brown's prior juvenile delinquency adjudications on the grounds that the adjudications were irrelevant and highly prejudicial. Defense counsel argued that evidence regarding Brown's prior finding of delinquency for possession of controlled substances was proper for the purposes of impeachment. After argument on the issue, the trial court granted the State's motion on the ground that the prejudicial effect of the evidence outweighed its probative value.

### The Jury Trial

The victim testified that on September 6, 2003, at about 1:20 p.m., he was driving his black GMC Yukon Denali sports utility vehicle on West 51st Street and South Ashland Avenue in Chicago, Illinois. According to the victim, while he was stopped at a red light, a tall black man wearing a white shirt and a white baseball jersey appeared at his open driver's-side window. The victim testified that the man put a gun to his left temple and told him to "get out of the fucking truck, mother fucker." The victim refused to do so and tried to pull the gun down, away from his head. The victim testified that he kept his eyes on the gun and the offender's face. The victim testified that he struggled with the man, but the assailant stepped back and fired into the truck, shooting him twice in the stomach and once in the left arm.

The shooter ran away and the victim drove a few blocks west to the intersection of West 51st Street and South Paulina Avenue and called 911. The victim testified that he could not really say how long his encounter with the assailant lasted, but finally explained it "could be five seconds, could be ten seconds, I don't know." The victim admitted that during the encounter he was scared for his life. On October 25, 2003, the victim went to the police station to view two lineups. The victim stated that he did not identify anyone in the first lineup, but that he identified defendant as the offender in the second lineup.

Norman Brown

Norman Brown testified that, at the time of the shooting, he and defendant were residents of the group home, located at 1458 West 51st Street, which is overseen by the Illinois Department of Children and Family Services (DCFS). Brown testified that defendant had been under the care of DCFS since the age of four and was a member of the Blackstone street gang.

On the day of the shooting, only three boys resided at the group home, defendant, Brown, and Isaac Prittard.

Brown explained that the group home was run by child care technicians who noted in a log book the comings and goings of the boys. Brown testified that the boys were free to leave the group home whenever they wanted before a 10:30 p.m. curfew. However, if one of the boys wanted to leave after curfew, he did not have to "sneak" out, but could simply walk past the child care worker on duty and out the back door. Brown testified that the child care worker would not stop the boy from leaving, but would note it in the logbook, and then the child care worker would file a report with the police. The police would then look for the boy.

Brown testified that on the day in question he, defendant, and Prittard left the group home to get some cigarettes. As the three were walking back to the group home, they saw the victim in his black Yukon Denali. Brown testified that when the victim stopped at a red light, defendant pulled out a chrome pistol, shot at the victim three or four times, and ran away. Brown stated that after the shooting, he ran back to the group home and did not recall seeing defendant again until the next day.

During cross-examination, Brown confirmed that during a conversation with defendant's counsel the day before trial, he said he did not know whether defendant had committed the crime or not. In addition, Brown testified that he had a daily marijuana habit both at the time of the offense and at the time of trial. Defense counsel questioned Brown extensively concerning his drug use and whether he sold drugs to Eyvonne Ford, another State witness. The State objected to this line of questioning.

The trial court held a sidebar to argue the issue. The State argued that this line of questioning was another attempt by the defense to introduce Brown's juvenile delinquency adjudications, which were already addressed in the motion *in limine*. The State argued that if the defense wanted to pursue this line of questioning, it would need an offer of proof. The trial court found that because defense counsel's information that Brown sold drugs to Eyvonne Ford and that she smoked crack was based solely on defense counsel's conversation with his client, and because defense counsel was not offering to put his client on the stand to lay the foundation, that he could not go any further with this line of questioning.

Eyvonne Ford

Eyvonne Ford, a 41-year-old woman, testified that she lived near the group home and that she knew defendant, Brown, and Prittard because they would "sneak" out of the group home late at night and go to her house to hang out with her 19-year-old son. Ford testified that she was so close to defendant and Brown that they called her "Mom." Ford testified that she allowed the boys to come into her home until a man from the group home asked her to stop.

Ford testified that on the day in question, she was walking on South Ashland Avenue toward West 51st Street when she was approached by defendant, Brown, and Prittard. Ford testified that defendant told her that he had just shot a "Scipe," which Ford understood to mean a member of the street gang Satan Disciples. Ford testified that she knew that defendant, Brown, and Prittard were members of the Blackstones street gang and that at the time of the shooting the Blackstones were at war with the Satan Disciples. Ford testified that, at first, she doubted what defendant told her because she knew him to be a liar.

However, Ford testified that she spoke with her sister after speaking with defendant. When she told her sister what defendant had said, her sister stated that she had seen a man lying on the ground who had been shot near West 51st Street and South Paulina Avenue. Ford testified that she and her sister went to the scene of the crime and spoke with a police officer who directed her to the 9th District. Ford testified that she called the 9th District and told them that she had information concerning the shooting.

## Detective Will Svilar

Detective Will Svilar testified that he was assigned to investigate the shooting. Svilar testified that he was informed that Ford had contacted the 9th District with information pertaining to the shooting. During an interview with Ford, she gave Svilar two names and a nickname: Norman Brown, Isaac Prittard, and defendant's nickname "Travo." Svilar testified that on October 25, 2003, he went to the group home and placed Brown and Prittard under arrest. He brought them to Area 1 and arranged for them to take part in a lineup.

Svilar testified that he was with the victim when he viewed the first lineup. The lineup contained Brown, Prittard, and four other people. All six individuals stepped forward individually and said "get out of the truck mother fucker." Svilar testified that at the conclusion of this lineup, the victim was unable to identify anyone. Defendant subsequently entered the police station that evening looking for Brown and Prittard. Svilar took defendant into custody and called the victim back to the police station to view a second lineup, this time with defendant in the lineup. The victim positively identified defendant as being the same man who had shot him.

## The Motion for Directed Finding

-6-

The State rested and defendant's counsel moved for a directed finding, arguing that the State failed to show the requisite intent for a conviction of attempted first degree murder. Defendant argued that the evidence presented by the State, including the location of the victim's wounds, showed only an accidental shooting during a struggle for the gun. In addition, the defense argued that the State failed to meet the elements for the charge of attempted vehicular hijacking because the evidence only showed that the assailant told the victim to get out of his truck. The defense argued that there was no evidence to show that the assailant intended to take the victim's truck after he got out. The defense also argued that the assailant did not explicitly threaten physical harm. The defense argued that as a result, the State failed to establish the elements of either attempted murder or attempted vehicular hijacking and a directed finding should be entered with regard to both charges.

The State responded that it had presented sufficient evidence on the charge of attempted first degree murder. With regard to the attempted vehicular hijacking charge, the State argued that "[p]ointing a gun at a driver of a car and saying get out of car***. That alone is an attempt to take a car from somebody." The trial judge denied defendant's motion on the grounds that the State had presented enough evidence to establish the elements of both attempted first degree murder and attempted aggravated vehicular hijacking.

Defendant's Case

Valerie Panozzo, an assistant public defender with the Cook County public defender's office, testified that she had a conversation with Brown on the first day of trial. Panozzo testified that Brown said that he was closer to Prittard than defendant. Panozzo also testified that Brown

stated that he did not see anything on the day of the shooting; that he did not see the person who shot the victim; and that he did not see defendant with a gun.

Milot Cadichon, a Chicago police officer, testified that he witnessed the shooting. Cadichon testified that on September 6, 2003, he was in the vicinity of West 51st Street and South Ashland Avenue, on his way home from his second job. Cadichon testified that he was stopped at a red light when he saw a black male walk up to the victim's car, pull out a silver gun, and stick it in the driver's face. Cadichon testified that he was unable to cross the intersection to help the victim, so he dialed 911 and told them that he was witnessing a carjacking. As he continued to watch, he saw the victim and a black male struggling over the gun, and eventually the black male stepped back and fired three to five shots into the car. Cadichon heard three to five shots, then watched as the offender fled the scene in a Chevy or Buick. Cadichon testified that the offender was a young black man, approximately 6 feet tall, weighing about 150 pounds with hair in short, close braids going toward the back of his head.

Cadichon testified that later that day he was shown a photo array containing seven photos, including photos of defendant, Brown, and Prittard. Cadichon testified that he identified Isaac Prittard as the shooter and identified Brown as the man in the getaway car, but he did not identify defendant. Cadichon also testified that on October 25, 2003, he viewed the first lineup and made two identifications of people he saw at the scene of the shooting. One person was Brown and the other was Isaac Prittard, but he could not make a positive identification as to the shooter.

Brian Gary, child care worker for DCFS employed at the group home, testified that at the time of the shooting, defendant, Brown, and Prittard were residents of the group home. Gary

testified that child care workers at the group home would make notations in a logbook documenting the comings and goings of the boys. Gary testified that on the day in question, the logbook stated that the first to leave the home was Brown at 12:30 p.m., followed by Prittard at 12:45 p.m., and lastly defendant at 1:45 p.m. Gary testified that he was the only person on duty that day and stated that his testimony was solely based on the log book; he had no independent recollection of the events of September 6, 2003. On cross-examination, the State pointed out that the 4 p.m. entry indicated that Prittard was in the group home, but the logbook did not indicate when he had returned. Similarly, the 4 p.m. logbook entry indicated that defendant was out on a pass, while the 4 p.m. census sheet entry indicated that he was at the group home.

The Jury Verdict, Sentencing, and Posttrial Motions

After closing arguments, the jury received the case and found defendant guilty of attempted first degree murder, aggravated battery with a firearm, and attempted aggravated vehicular hijacking. Defense counsel filed a motion for judgment of acquittal or, in the alternative, a motion for a new trial. At the hearing on defendant's motions, defense counsel argued that all of the State's witnesses presented contradictory testimony and that the State was therefore unable to prove defendant guilty beyond a reasonable doubt. The trial court denied defendant's motion, stating that there was enough evidence presented at trial for the jury to convict.

During the sentencing hearing, the State argued that the court make a finding of severe bodily injury, which would mandate that the attempted aggravated vehicular hijacking sentence be served consecutively to the sentences for attempted murder and aggravated battery with a firearm.

Defense counsel argued that the State's request was in violation of *Apprendi* because a finding of severe bodily injury must be made by the jury. The trial court found that there was indeed a severe bodily injury suffered by the victim. The trial court also found that:

> "[A]s to the attempt murder and aggravated battery charges they will merge as being for sentencing purposes I will sentence as to Count 1 and 2 to twelve years in the Illinois Department of Corrections. And there will be a consecutive sentence on Count 3 the attempt aggravated vehicular hijacking of four years in the Illinois Department of Corrections."

On February 25, 2005, defendant filed a motion to reconsider sentence and vacate conviction. Defendant argued that his conviction for aggravated battery with a firearm should be vacated because the conviction was improper under the one-act, one-crime doctrine. Defendant also argued that the imposition of consecutive sentences for the attempted first degree murder and attempted aggravated vehicular hijacking convictions was in error for the following reasons: (1) a judicial finding of severe bodily injury violated *Apprendi*; (2) defendant received no notice from the State that it would be seeking consecutive sentencing and therefore was not given a reasonable opportunity to present evidence or cross-examine witnesses in rebuttal of the State's claim of severe bodily injury; and (3) the court's finding of severe bodily injury was not supported by the evidence. The trial court denied the motion, finding that (1) defendant's conviction for aggravated battery with a firearm did not violate the one-act, one-crime doctrine, as the trial court merged the sentence for that conviction into the sentence for attempted first degree murder; (2) the 12-year merged sentence took into consideration defendant's age and lack of criminal

-10-

background; and (3) the finding of severe bodily harm was appropriate given the victim's trial testimony regarding his hospital stay and recovery from the gunshot wounds. Defendant timely appealed his conviction and sentence.

## II. ANALYSIS

### A. Right to Confront Witnesses

The first issue raised by defendant is the major issue on appeal. Defendant argues that the trial court violated his sixth amendment right to confront his accusers when it refused to allow him to impeach the testimony of the State's witnesses with Brown's prior adjudication of delinquency. Defendant argues that the prior adjudication was necessary to show Brown's lack of veracity and prove the bias resulting from Ford's need to procure drugs from Brown. Defendant, citing *People v. Triplett*, 108 Ill. 2d 463, 486 (1985), argues that the trial court made "a [c]onstitutional error of the first magnitude" and that "no amount of showing of want of prejudice [could] cure it."

Defendant asserts that he has an absolute and unqualified right to impeach the credibility of witnesses against him. Defendant cites to several cases establishing the propriety of the introduction of a witness' prior adjudication of delinquency or drug use for impeachment. *People v. Strother*, 53 Ill. 2d 95, 99 (1972); *People v. Atkinson*, 186 Ill. 2d 450, 461-62 (1999); *People v. Redmond*, 146 Ill. App. 3d 259, 263 (1986); *People v. Crisp*, 242 Ill. App. 3d 652, 659 (1992); *Triplett*, 108 Ill. 2d at 473-74. Defendant argues that these bases alone were sufficient to allow examination of Brown's prior adjudication.

Defendant argues that he was precluded from discovering additional evidence to make a

preliminary showing that Brown received favorable treatment for his testimony or that he faced the threat of charges, as this information was completely under the State's control. Defendant asserts that Brown's prior adjudication provided the preliminary showing and the only other means of determining if he had other charges dismissed was to ask Brown on the stand. Defendant argues that this informal offer of proof was sufficient to allow use of the prior adjudication to impeach Brown and Ford. *Yamada v. Hilton Hotel Corp.*, 60 Ill. App. 3d 101, 110 (1977). Defendant asserts that his counsel's comment that his conversations with defendant elicited the information that Ford purchased drugs from Brown and was motivated to lie to maintain her drug supply was an adequate offer of proof. Defendant argues that the trial court erred in granting the motion *in limine* and later excluding questioning on this issue when he provided the informal offer of proof.

The State argues that the trial court properly barred Brown's prior adjudication of delinquency because it represented a fishing expedition by defendant. The State argues that, because defendant made no offer of proof at trial, he waived arguing the theories that Brown lied to stay out of trouble or that Brown and Ford had a narcotics-based relationship. *People v. House*, 197 Ill. App. 3d 1017, 1023 (1990). Counsel for defendant stood on his discussions with defendant as his offer of proof, arguing that, even though defendant would not take the stand, that was enough to allow his impeachment attempt. The State concludes that since there was no evidence to support defendant's contention, the argument was either waived or the evidence was properly excluded as prejudicial with little to no probative value.

The State distinguishes *Triplett*, defendant's central authority in his argument, from this

case and argues that defendant's reliance is misplaced. A witness in *Triplett* was in the custody of the Department of Corrections at the time of the defendant's trial as a result of his adjudication of delinquency. *Triplett*, 108 Ill. 2d at 474. Furthermore, the witness had 10 juvenile delinquency petitions filed against him between the time of the crime in question and the defendant's trial and had been adjudicated delinquent on two of them while the State retained leave to reinstate four of the petitions. *Triplett*, 108 Ill. 2d at 474. The *Triplett* court found that the defendant was denied his right to confront the witness against him because he was precluded from cross-examining the witness about the 10 juvenile delinquency petitions filed against him and the numerous ways the witness could be influenced to testify to what the State wanted. *Triplett*, 108 Ill. 2d at 486. Therefore, the State concludes, the facts of this case, *i.e.*, that Brown had a prior adjudication for delinquency, no petitions pending and was not under the control of the Department of Corrections, distinguish it from *Triplett*.

The trial court has discretion to impose reasonable limits on cross-examination to limit possible harassment, prejudice, jury confusion, witness safety, or repetitive and irrelevant questioning, and we review a defendant's claim of a violation of the confrontation clause under the abuse-of-discretion standard. *People v. Blue*, 205 Ill. 2d 1, 13-14 (2001). As summarized in *Blue*, cross-examination is "'the greatest legal engine ever invented for the discovery of truth'", and latitude is granted for counsel to explore the partiality of the witness. *Blue*, 205 Ill. 2d at 12, quoting 5 J. Wigmore, Evidence §1367, at 32 (Chadbourn rev. ed. 1974). However, the *Blue* court also notes that this latitude is "'[s]ubject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation.'" *Blue*, 205 Ill. 2d at 12, quoting *Davis v.*

1-05-1640

*Alaska*, 415 U.S. 308, 316, 39 L. Ed. 2d 347, 353-54, 94 S. Ct. 1105, 1110 (1974).

A judge may limit the scope of cross-examination and unless the defendant can show his or her inquiry is not based on a remote or uncertain theory, a court's ruling limiting the scope of examination will be affirmed. *People v. Phillips*, 186 Ill. App. 3d 668, 678 (1989). When a line of questioning is objected to or denied by the trial court, the defendant must set forth an offer of proof either to convince the trial court to allow the testimony or to establish on the record that the evidence was directly and positively related to the issue of bias or motive to testify falsely. *Phillips*, 186 Ill. App. 3d at 678. A formal offer of proof is typically required; however, an informal offer of proof, involving counsel's summary of what the proposed evidence might prove, may be sufficient if specific and not based on speculation or conjecture. *Phillips*, 186 Ill. App. 3d at 679.

In *Phillips*, defense counsel made only informal offers of proof regarding two witnesses' alleged drug use and suspension for taking a bribe. Defense counsel argued that the impeaching evidence was not based on mere rumor or speculation but based on documented evidence and interviews with witnesses. The trial court found that defense counsel merely gave a brief description of what the proposed evidence would show and did not provide a detailed explanation as to how witnesses knew of the proposed evidence or provide any tangible evidence. *Phillips*, 186 Ill. App. 3d 677-78. Therefore, this court affirmed the trial court's finding that the alleged impeaching matters were based on conjecture and exclusion of that testimony was not an abuse of discretion. *Phillips*, 186 Ill. App. 3d at 679.

We disagree with the State that defendant did not submit any offer of proof. However, we

-14-

find that counsel's informal offer of proof was properly rejected by the trial court and insufficiently specific to preserve the alleged error for review. Defense counsel's informal offer of proof was, like that in *Phillips*, simply a conclusory statement based on his conversation with defendant and speculation. Counsel did not give details about how defendant knew Ford relied upon Brown for her needed drug supply, or that Brown was testifying to mollify the police and stay out of trouble. Counsel revealed no specific information or testimony in support of his contention.

We also agree with the State that *Triplett* is distinguishable from this case and does not mandate reversal on constitutional grounds. The witness at question in *Triplett* was in custody at the time of trial. The witness also had 10 separate petitions for juvenile delinquency against him, with several that still could be reinstated by the State at the time of the trial. Brown had a singular adjudication of juvenile delinquency for possession of a controlled substance. He was a ward of the State at the time of trial, not under the custody of the Department of Corrections. Counsel provided no offer of proof that Brown was motivated to testify falsely in exchange for leniency from the police. The facts of this case, unlike those in *Triplett*, do not provide the support for that claim or implicate constitutional protections.

Even if the exclusion of Brown's prior adjudication of delinquency were improper, we find that the exclusion would not be sufficiently prejudicial to warrant a new trial. *House*, 197 Ill. App. 3d at 1023. There are three approaches to determine whether an error is harmless beyond a reasonable doubt: (1) whether the error contributed to the conviction; (2) whether the other evidence presented overwhelmingly supports conviction; and (3) whether the evidence that was

excluded was duplicative or cumulative. *People v. Gonzalez*, 104 Ill. 2d 332, 338-39 (1984). The evidence at trial satisfies the first two approaches.

The State presented eyewitness testimony of the victim who positively identified defendant as the shooter. Testimony of Brown's regular drug use was elicited at trial. Brown's troubled past was also presented, as his placement in the group home and oversight by DCFS was established. Therefore, the probative value of Brown's adjudication was minimal. Furthermore, even if Brown's testimony were fully discounted, the fact remains that the State presented the testimony of the victim, which was sufficient to find defendant guilty beyond a reasonable doubt, and exclusion of Brown's adjudication was not so prejudicial to require a new trial. Therefore, it cannot be said that the exclusion of Brown's delinquency adjudication led to his conviction. The other evidence presented by the State, namely, the eyewitness identification by the victim, supported defendant's conviction. Accordingly, even if there were error in excluding the evidence, that error would be harmless.

B. Motion for Directed Finding and Proof Beyond a Reasonable Doubt

Defendant next argues that the trial court erred in denying his motion for directed finding of not guilty. Inherent in review of this issue is a review of defendant's third argument, that the State failed to prove his guilt beyond a reasonable doubt. Therefore, both arguments will be addressed together.

A motion for directed finding presents a question of law, and our review is *de novo*. *People v. Connolly*, 322 Ill. App. 3d 905, 917-18 (2001). In considering the denial of such a motion, we review the evidence presented by the State, in a light most favorable to the State, to

determine whether a reasonable mind could fairly conclude defendant was guilty beyond a reasonable doubt. *Connolly*, 322 Ill. App. 3d at 918. Similarly, in assessing the sufficiency of the evidence to sustain a verdict on appeal, we do not retry the defendant; rather, we must view the evidence in the light most favorable to the prosecution to determine if "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (Emphasis omitted.) *People v. Bush*, 214 Ill. 2d 318, 326 (2005), quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2788-89 (1979).

"This means that [we] must allow all reasonable inferences from the record in the favor of the prosecution." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). Where the evidence allows conflicting inferences, resolving such conflicts is within the province of the jury. *People v. Campbell*, 146 Ill. 2d 363, 380 (1992). Likewise, the determination of a defendant's intent from circumstantial evidence is a task best suited for the jury. *People v. Moore*, 358 Ill. App. 3d 683, 688 (2005). The jury need not search out explanations consistent with the defendant's innocence when determining whether a reasonable doubt exists. *People v. Campbell*, 146 Ill. 2d 363, 380 (1992).

Further, where the jury's determination is dependent upon eyewitness testimony, its credibility determinations are entitled to great deference and will be upset only if unreasonable. *Cunningham*, 212 Ill. 2d at 280. In fact, the jury may believe as much, or as little, of any witness' testimony as it sees fit. *People v. Mejia*, 247 Ill. App. 3d 55, 62 (1993). Whether eyewitness testimony is trustworthy is typically within the common knowledge and experience of the average juror. *People v. Clark*, 124 Ill. App. 3d 14, 21 (1984). If trustworthy, a single positive

eyewitness identification may be sufficient proof of guilt. *People v. Rojas*, 359 Ill. App. 3d 392, 397 (2005). Thus, we will not substitute our judgment for that of the fact finder on what weight is given to the evidence presented or the credibility of the witnesses. *Campbell*, 146 Ill. 2d at 375.

A defendant is guilty of attempt if, "with intent to commit a specific offense, he does any act that constitutes a substantial step toward commission of that offense." 720 ILCS 5/8-4(a) (West 2004). Therefore, for attempted first degree murder, the State must prove defendant intended to kill the victim. *People v. Slywka*, 365 Ill. App. 3d 34, 44 (2006); 720 ILCS 5/9-1(a)(1) (West 2004). For attempted aggravated vehicular hijacking, the State must prove defendant intended to take the victim's motor vehicle by the use of force or threat of imminent use of force while armed with a firearm. 720 ILCS 5/18-3, 4 (West 2004). Finally, in order to sustain a charge of aggravated battery with a firearm, the State must prove that the defendant "knowingly or intentionally" caused injury to another person by means of discharging a firearm. 720 ILCS 5/12-4.2(a) (West 2004). A person acts knowingly if he is consciously aware that his conduct is practically certain to cause injury (720 ILCS 5/4-5 (West 2004)), while a person acts recklessly if "he consciously disregards a substantial and unjustifiable risk" that the victim would be harmed (720 ILCS 5/4-6 (West 2004)).

Defendant argues that, even when viewed in a light favorable to the prosecution, the totality of the evidence leaves reasonable doubt as to the identity of the perpetrator and that intent had not been proven by the State. Defendant argues that two of the State's witnesses, Brown and Ford, were inherently incredible based on their habitual drug use and abuse and their contradictory

testimony. Defendant also argues that the victim's testimony did not credibly identify defendant, especially when reviewed in conjunction with Cadichon's testimony. Furthermore, defendant claims the State failed to overcome the testimony of Gary, the DCFS employee who was on duty at the group home at the time of the crime.

Defendant also maintains that the victim's testimony was incredible. Defendant argues that the victim had a gun pointed at his head and then engaged in a struggle that resulted in his being shot. Therefore, defendant concludes that the victim's identification of him in a lineup six weeks after the crime is not only suspect, but incredible. Defendant argues that the testimony of a trained police officer, Cadichon, who witnessed the crime in broad daylight from across the intersection, identifying Prittard as the shooter overcomes the victim's testimony and establishes a reasonable doubt.

In addition, defendant notes that Gary's testimony that the logbook for the group home indicated that defendant was at the group home at the time of the crime while both Prittard and Norman were checked out. Defendant notes that the State did not impeach Gary's testimony or the logbook records. Defendant argues that this evidence, the contradictory testimony of the State's other witnesses, and the inherent lack of reliability of the victim's identification require a reversal of his convictions.

Defendant concedes that intent may be inferred from circumstantial evidence established at trial. *People v. Johnson*, 331 Ill. App. 3d 239, 250 (2002). Defendant also concedes that simply firing a gun at a person with disregard for human life may sufficiently support a conclusion of

intent. *People v. Mitchell*, 209 Ill. App. 3d 562, 569 (1991). However, defendant argues that the evidence presented by the State did not establish intent necessary for his convictions and the order denying the motion for directed finding and the convictions must be reversed.

Defendant claims that the State's evidence merely indicates that there was a struggle between the victim and the assailant and not an intent to kill the victim. Defendant asserts that the evidence demonstrates that the gun was discharged accidentally as a result of the struggle and that any "pulling back" by the assailant could have been the result of the struggle and not a conscious step back to fire the gun at the victim. Defendant also claims that there was no proof that defendant intended to knowingly take the victim's motor vehicle with respect to his attempted aggravated vehicular hijacking charge. Defendant argues that the only evidence presented was that the assailant told the victim to get out of his truck.

We agree with the State that the evidence presented supports the trial court's denial of defendant's motion for directed finding and the jury's finding of guilt beyond a reasonable doubt. The evidence at trial included the eyewitness identification of the victim, which, as noted above, is sufficient to uphold a conviction if found trustworthy by the jury. The contradictions identified between Brown and Ford and the inherent lack of reliability of such habitual drug users is well-noted. However, the jury was free to disregard such witnesses if it chose to do so, in light of the victim's testimony. Further, we will not second-guess the jury's finding that the victim's testimony regarding his face-to-face encounter was more reliable than that of Cadichon. With respect to Gary and the logbook, the State notes that the testimony at trial indicated that entries into the logbook were not reliable evidence. In fact, Gray testified to errors in the logbook on the

1-05-1640

day of the crime.

The evidence at trial indicated that defendant approached the victim's motor vehicle at the stoplight with malice aforethought. Defendant produced a firearm and told the victim to get out of the car. Next, a struggle ensued and defendant stepped back and fired three shots at the victim. The fact that defendant fired his gun three times at the victim alone supports the jury's finding of an intent to kill under *Mitchell*. Furthermore, defendant's threatening words and actions support the rational inference that his conscious objective was to hijack the victim's motor vehicle and intentionally harm the victim by discharging his firearm.

## C. One Act, One Crime

Defendant argues that his conviction for aggravated battery with a firearm must be vacated based on the one-act, one-crime rule. *People v. Crespo*, 203 Ill. 2d 335 (2001). Under the one-act, one-crime rule, a defendant may be convicted for one crime resulting from a single act. *People v. Dresher*, 364 Ill. App. 3d 847, 863 (2006). Our review of this issue is *de novo*. *Dresher*, 364 Ill. App. 3d at 863.

The parties do not dispute the fact that the shots fired by defendant constitute one act. Defendant asserts that the trial court based its sentencing upon the multiple convictions for the same act and that case law clearly requires that the lesser charge must be vacated. *People v. Lee*, 213 Ill. 2d 218, 226 (2004). Defendant continues to argue that the matter must be remanded for a new sentencing hearing because the trial court based its sentencing decision on the multiple convictions, but he cites no authority for that proposition.

-21-

The State argues that *Crespo* is inapplicable to this case and that defendant has simply misconstrued the statements of the trial court at sentencing. The State maintains that the trial court did not enter two six-year sentences for the attempted murder and aggravated battery with a firearm convictions, but a single 12-year sentence. In fact, the trial court stated that the convictions were merged for sentencing, and the sentencing order reflects that merger. The State concludes, also without authority, that this court should uphold defendant's sentence and both convictions.

Our research has found that *People v. Radford*, 359 Ill. App. 3d 411 (2005), is most instructive to this case. In *Radford*, the defendant was convicted of attempted armed robbery and attempted aggravated robbery based on the single act of grabbing a man, pretending a glass bottle was a gun, and demanding money. *Radford*, 359 Ill. App. 3d at 413. The trial court found that the lesser conviction should be vacated because our supreme court has "clearly held" that an indictment must indicate an intention to treat a defendant's conduct as multiple acts to support multiple convictions. *Radford*, 359 Ill. App. 3d at 413, citing *Crespo*, 203 Ill. 2d at 345. Therefore, where more than one conviction is based on the same physical act, "'the less serious offense must be vacated.'" *Radford*, 359 Ill. App. 3d at 419, quoting *Lee*, 213 Ill. 2d at 226-27. Accordingly, the conviction for aggravated battery with a firearm must be vacated.

However, we agree with the State that remand for resentencing is unnecessary. Under *Radford*, upon vacatur of a conviction under the one-act, one-crime rule, remand for re-sentencing is not necessary absent an indication that the sentence imposed was improper. *Radford*, 359 Ill. App. 3d at 419-20. The imposition of a sentence will not be disturbed absent an

abuse of discretion. *People v. Burrage*, 269 Ill. App. 3d 67, 77 (1994). We grant the trial court great deference, as it is in the best position to determine a proper sentence based on the particular facts and circumstances of the case and attributes of the defendant such as his credibility, demeanor, and general moral character. *People v. Kennedy*, 336 Ill. App. 3d 425, 433 (2002). A sentence that is within statutory guidelines will be modified only if it is "greatly at variance with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense." *Kennedy*, 336 Ill. App. 3d at 433.

In this case, the trial court made it abundantly clear following defendant's motion to reconsider sentence that it had merged the convictions and imposed one sentence for the one act. Specifically, the trial court stated:

"My ruling is as follows. As to point one, the attempt murder and aggravated battery, I believe that it was the jury's decision that they found convictions for both the attempt murder and aggravated battery. I found that that was one act, and that is why there was sentences as to attempt murder with the aggravated battery merging. *There was only one sentence as to the 12 year sentence.*" (Emphasis added).

The sentencing guidelines for Class X felonies are from 6 to 30 years' imprisonment and for a Class 1 felony from 4 to 15 years' imprisonment. 730 ILCS 5/5-8-1(a)(3), (a)(4) (West 2004). The sentences imposed for attempted first degree murder and aggravated vehicular hijacking are well within the guidelines. While the trial court agreed with defendant that his case was not the worst the court had ever seen, it specifically found defendant's actions were repulsive

and required more than the statutory minimum. The trial court noted mitigating factors and determined that defendant "certainly deserved" a sentence of 12 years for his egregious actions. The trial court did not abuse its discretion and properly imposed a sentence of 12 years' imprisonment for defendant's attempted murder conviction.

### D. Sentence Enhancement

Defendant asserts that the consecutive sentence imposed was unconstitutional under *Apprendi* and *Blakely v. Washington*, 542 U.S. 296, 159 L. Ed. 2d 403, 124 S. Ct. 2531 (2004). Defendant focuses on the language in *Blakely* that "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings." (Emphasis omitted.) *Blakely*, 542 U.S. at 303-04, 159 L. Ed. 2d at 413-14, 124 S. Ct. at 2537. In *Blakely*, the defendant pled guilty to second degree kidnapping, which carried a maximum sentence of 10 years' incarceration under the State of Washington's sentencing guidelines. However, the defendant pled guilty, and the sentencing guidelines lowered the maximum for guilty pleas to 53 months. Therefore, the United States Supreme Court found that 53 months was the maximum sentence and the trial court violated *Apprendi* by imposing a 90-month sentence based on a finding of deliberate cruelty. *Blakely*, 542 U.S. at 302-04, 159 L. Ed. 2d at 413-14, 124 S. Ct. at 2537-38. Defendant argues that the trial court increased defendant's penalty in violation of *Apprendi* and *Blakely* by finding severe bodily injury existed without submitting that question of fact to the jury and ordering his sentences be served consecutively.

The State, citing *People v. Wagener*, 196 Ill. 2d 269, 286 (2001), and *People v. Carney*,

1-05-1640

196 Ill. 2d 518 (2001), argues that our supreme court has repeatedly held that *Apprendi* concerns are not implicated by consecutive sentencing. The State notes that defendant was convicted of two Class X felonies, attempted murder and aggravated battery with a firearm, which were merged, and one Class 1 felony, attempted aggravated vehicular hijacking. The State argues that the Unified Code of Corrections requires the sentencing court to impose consecutive sentences where one of the crimes committed was a Class X or Class 1 felony and severe bodily injury was inflicted. 730 ILCS 5/5-8-4(a)(i) (West 2004). Therefore, the State concludes that the sentences imposed were within the guidelines and did not invoke *Apprendi*. The trial court's order sentencing defendant to 12 years' imprisonment for attempted murder and aggravated battery with a firearm, followed by a consecutive sentence of 4 years' imprisonment for attempted aggravated vehicular hijacking, was within the statutory guidelines mandating such a sentence.

We agree with the State. In *People v. Lucas*, 342 Ill. App. 3d 58, 64 (2003), this court explained that the *Wagener* and *Carney* courts found that the imposition of consecutive sentences did not implicate *Apprendi* because such an order only affects the manner in which the sentences are served, not the length of the sentences. This court has also found that *Blakely* is "simply an application of *Apprendi*" and not an expansion of that case. *Weidner v. Cowen*, 361 Ill. App. 3d 664, 666 (2005). *Blakely* involved the imposition of the singular sentence for the defendant's crime, not a consecutive sentence. Accordingly, we follow our established precedent, and defendant's consecutive sentences are affirmed.

### III. CONCLUSION

For the foregoing reasons, we vacate defendant's conviction for aggravated battery with a

1-05-1640

firearm and affirm the decision of the trial court with respect to the remaining issues. The mittimus shall be corrected to reflect only defendant's convictions and sentences for attempted first degree murder and aggravated vehicular hijacking.

_____Affirmed in part and vacated in part.

CAMPBELL, J., concurs.


JUSTICE NEVILLE, dissents:

I respectfully dissent because I believe that Tabb was denied a fair trial. First, Tabb was denied a fair trial when the trial court did not order the State to comply with Supreme Court Rule 412 (a) (188 Ill. 2d 412(a)) by disclosing to Tabb the pending and prior juvenile adjudication records for Norman Brown, the State's eyewitness. Second, Tabb was denied his right to a fair trial when the trial court granted the State's motion *in limine* and deprived Tabb of his sixth amendment right to cross-examine Brown, a juvenile witness, about pending or prior adjudications.

DISCLOSURE TO THE ACCUSED

The record reveals that on December 3, 2003, Tabb filed a discovery request in which he specifically requested that the following information be disclosed by the State:

"9. Prior criminal records of State's witnesses to be used

for impeachment.

10. It is further requested that the prosecution disclose

whether there is pending against any witness listed in paragraph (2)

-26-

supra, any criminal or civil action involving the People of the State of Illinois or any such action pending during the pendency of the prosecution of the accused, and if so, full disclosure as to the nature and outcome of such legal action or actions."

The State answered Tabb's discovery request as follows

"No known record of criminal conviction which can be used for impeachment of intended State witnesses ***. "

After the trial commenced, the record reveals that the following colloquy took place after jury selection was concluded:

"MR. CHEVLIN: Judge, we have a motion *in limine*. I was just informed by Defense Counsel that they have a certified copy of a juvenile conviction against one of our witnesses, Norman Brown. I was not aware of it. I do know he has no adult convictions. Frankly, I don't think we ran a juvenile background on him.

We would be objecting to any use of a juvenile conviction for impeachment purposes. It's not a conviction. It's a finding of delinquency. It's – One, it's a juvenile record, and, two, it's not a conviction. It's a finding of delinquency. Its not the same thing."

The colloquy reveals that after jury selection, the assistant State's Attorney (ASA) informed the court that he was making a motion *in limine* because defense counsel had a certified copy of a

juvenile conviction for Norman Brown, one of the State's witnesses. The ASA further informed the court that he was unaware of Brown's juvenile conviction. However, the ASA informed the court that he was sure Brown had no adult convictions. Finally, the State made the following admission: "I don't think we ran a juvenile background on him."

It is clear from the colloquy that the State did not run a juvenile background check on Norman Brown, the State's juvenile witness. In addition, it appears from the colloquy that the State had decided that Tabb was not entitled to the information it had concerning Brown's juvenile background because the ASA believed that a finding of delinquency was not a "conviction."

Later, during the hearing on the State's motion *in limine*, Tabb's attorney informed the court that on November 8, 2004, the day before the trial, the State tendered a copy of Brown's background from the Chicago police department:

> "MR. THEDFORD: *** As the Court knows Chicago Police Department background as a juvenile will indicate that a case was charged and referred to court. It's illegal to tender to indicate what the disposition of the case was.
>
> Based on the Court's order you signed yesterday we called over to the juvenile facility, fax'd them a copy of that order and they then informed us orally what the conviction is. It was one conviction for PCS.[1]"

---

[1] I assume that the attorney uses the acronym PCS to refer to a conviction for possession of a controlled substance. 720 ILCS 570/402 (It is unlawful for any person to knowingly possess

Tabb's attorney makes it clear that the State only provided Tabb with Brown's juvenile background information from the Chicago police department. Tabb's attorney explained that all the police department information revealed was that Brown was charged and referred to court. I note that Tabb's attorney did not complain about the State's failure to produce Brown's juvenile adjudications because he believed it was "illegal to tender to indicate what the disposition of the case was." The record reveals that on November 8, 2004, the day before the trial commenced, the trial court entered an order which provided that "the Public Defender may obtain any and all records of the Juvenile Dispositions for Norman Brown." I also note that it was not until the trial court issued its order and the order was faxed to the juvenile court that Tabb's attorney was informed, orally, that Brown had one conviction for PCS.

Tabb's December 3, 2003, discovery motion clearly requested that the State disclose (1) the prior criminal records of the State's witnesses; (2) any criminal or civil actions involving the State's witnesses that were pending; and (3) the outcome of any actions involving the State's witnesses. While Tabb's motion requested that the State disclose information about its witnesses, the juvenile background information provided by the State from the Chicago Police Department did not disclose if Brown had pending cases. The ASA's colloquy with the court makes it clear that the State did not believe that Tabb was entitled to the information he requested in his motion, therefore, the State did not run a background check in order to make a good-faith effort to comply with Supreme Court Rule 412(a)(6).

The trial court's order directing that Norman Brown's juvenile disposition records be

---

a controlled or counterfeit substance).

tendered to Tabb did not result in Tabb obtaining the records he requested in his discovery motion. Instead, Tabb was told orally that Brown had a PCS conviction. More importantly, it should be noted that while the State's witnesses' records were requested in Tabb's discovery motion that was filed on December 3, 2003, the oral information that Brown had a PCS conviction was not received until November 8, 2004, the day before the trial started. *People v. Redmond*, 146 Ill. App. 3d 259, 263 (1986), makes it clear that an adjudication of delinquency, probationary status, and pending criminal charges are admissible for impeachment, and impeachment comes within the purview of the *Brady* rule. Therefore, I believe that the State violated Supreme Court Rule 412 (a) (6) by failing to provide Tabb with the criminal records for its witnesses, specifically Norman Brown, that he requested in his discovery motion and that the State's violation was not corrected when the trial court entered its order because no juvenile records were tendered to Tabb. *Redmond*, 146 Ill. App. 3d at 263.

When there is a discovery violation, case law requires a reviewing court to determine whether the defendant was prejudiced by the discovery violation. See *People v. Greer*, 79 Ill. 2d 103, 120 (1980); *People v. Stokes*, 121 Ill. App. 3d 72, 75 (1984). Illinois follows Rule 609 of the Federal Rules of Evidence. See *People v. Montgomery*, 47 Ill. 2d 510, 516-19 (1971). Rule 609(d) provides that evidence of juvenile adjudications is generally not admissible, but permits the judge in a criminal case to admit evidence of a juvenile adjudication of any witness, other than the accused, if the adjudication involves the kind of offense that would be admissible as a prior conviction to attack the credibility of an adult and if the court is satisfied that the evidence is necessary for a fair determination of the issue of guilt or innocence. Fed. R. Evid. 609(d).

Brown is not the accused but a witness in this case so, according to Rule 609(d), his prior juvenile adjudications would be admissible evidence if Tabb met the two conditions in Rule 609(d). Fed. R. Evid. 609(d). Tabb meets the first condition in Rule 609 because it is axiomatic that a conviction for possession of a controlled substance could be used to attack the credibility of an adult; therefore, the evidence could be used to impeach Brown. Tabb also meets the second condition in Rule 609 because evidence concerning the juvenile delinquency adjudications of a witness is admissible for the purpose of showing motive or bias and, since Brown was an eyewitness and a suspect in the same crime, a fair trial necessitated that Brown be cross-examined with his juvenile adjudications. See *People v. Sharrod*, 271 Ill. App. 3d 684, 689 (1995) (evidence that a witness first accused the defendant at the time the witness was on juvenile probations can be explored by the defense on cross-examination to explore the bias of the witness; and the case was reversed because the State failed to disclose that its witness was on juvenile supervision). Brown had a motive to testify falsely because a police officer who witnessed the crime testified at the trial that Brown was one of the offenders. Therefore, Brown's credibility was at issue because he was also a suspect, and Tabb's ability to cross-examine Brown and to impeach him with his prior adjudications is evidence that was required for a fair determination of the issues. See *People v. Redmond*, 146 Ill. App. 3d 259, 264 (1986) (case reversed where State failed to disclose the criminal and juvenile records of a witness who was accused of being the perpetrator of the offense); *Stokes*, 121 Ill. App. 3d 72, 75-76 (1984) (case reversed where the State failed to provide defendant with witness' burglary conviction because the case hinged on credibility).

I acknowledge that the State's failure to comply with Tabb's discovery requirements does not automatically necessitate a new trial. *Harris*, 123 Ill. 2d at 151. I also acknowledge that a new trial should only be granted if Tabb was prejudiced by the discovery violation and the trial court failed to eliminate the prejudice. *Harris*, 123 Ill. 2d at 151-52; *People v. Cisewski*, 118 Ill. 2d 163, 172 (1987). Among the factors to be considered in determining whether a new trial is warranted are: (1) the strength of the undisclosed evidence; (2) the likelihood that prior notice could have helped the defense discredit the evidence; and (3) the willfulness of the State in failing to disclose. *Harris*, 123 Ill. 2d at 152.

I believe the State's undisclosed evidence, Brown's juvenile adjudication records, was important evidence that would have assisted Tabb in his defense. Brown's juvenile adjudication records were important because his prior adjudication would have allowed Tabb to impeach Brown in front of the jury and provide an explanation for his motive to lie. Cross-examination reveals biases, prejudices and ulterior motives of a witness, and one way to discredit a witness is to introduce evidence of a prior conviction. *People v. Blue*, 205 Ill. 2d 1, 12-13 (2001). Brown's records regarding "pending criminal matters," which the State did not look for, may have revealed that he was on probation or had other pending charges which would prompt him to cooperate with the State by lying to prevent the State from charging him with the offenses Tabb was charged with: attempted first degree murder, aggravated battery with a firearm and aggravated vehicular hijacking. The State's failure to provide Tabb with Brown's juvenile adjudication records was not cured by the trial court issuing an order because it produced no records and Tabb was prejudiced because the oral report was provided on the eve of his trial and it affected his

ability (1) to prepare his defense and make tactical decisions with the aid of the information, and (2) to impeach Brown and establish his biases, prejudices or ulterior motives in testifying for the State.

## IMPEACHMENT BY JUVENILE ADJUDICATIONS

The second question we must address is whether the trial court erred when it granted the State's motion *in limine* and excluded evidence concerning Brown's prior juvenile adjudication. When ruling on the State's motion, the court made the following statement:

> "THE COURT: Based on the cases you have cited in the highlighted area that these prior bad acts, weighing the probative nature versus the prejudicial nature, that is it is a Possession of Controlled Substance charge, looking - - weighing it I don't see where its probativeness outweighs the prejudicial effect.  I will deny your request."

The court held that the prejudicial nature of Brown's adjudication for possession of a controlled substance outweighed its probative value.  The trial court erred when it ignored Rule 609[2] and

---

[2] "(a) General rule. - For the purpose of attacking the credibility of a witness, (1) evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused.

* * *

applied Rule 403.[3] The trial court overlooked the fact that Rule 609(d) governs the admission of juvenile adjudications and permits juvenile adjudications to be admitted (1) if the offense would be admissible to attack the credibility of an adult, and (2) if the court is satisfied that the admission of the evidence is necessary for a fair determination of the issues. Fed. R. Evid. 609(d). First, as previously indicated, a conviction for possession of a controlled substance could be used to attack the credibility of an adult. Second, instead of using the prejudicial-effect-versus- probative-value test in Rule 403 when admitting juvenile adjudications, Rule 609 uses a fair- determination-of-the-issues test. Fed. R. Evid. 609(d). I submit that Brown was an eyewitness and a suspect in the crime; therefore, his juvenile adjudication records were necessary for his cross-examination and for a fair determination of the issues in Tabb's case. Accordingly, the trial court erred when it granted the State's motion *in limine* and excluded evidence concerning Brown's juvenile adjudications because Rule 609 does not use a prejudicial-effect-versus-probative-value test to determine whether the juvenile adjudications of a witness other than the accused are admissible in

---

(d) Juvenile adjudications. *** The court may, however, in a criminal case allow evidence of a juvenile adjudication of a witness other than the accused if conviction of the offense would be admissible to attack the credibility of an adult and the court is satisfied that the admission in evidence is necessary for a fair determination of the issue of guilt or innocence." Fed. Rs. Evid. 609(a), (d).

[3] Evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Fed. R. Evid. 403.

evidence.  Compare Fed. R. Evid. 609(d) with Fed. R. Evid. 403.

Even if the trial court used the prejudicial-effect-versus-probative-value test in Rule 403, it should have denied the State's motion.  Rule 609 provides that Rule 403 applies to witnesses other than the accused.  Fed. R. Evid. 609(a).   While Rule 403 applies to witness evidence other than juvenile adjudications (Fed. R. Evid. 609(d)), it provides that evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues or misleads the jury.  See Fed. R. Evid. 403.  The comment for Rule 403 makes it clear that "[v]irtually all evidence is prejudicial or it  isn't material." 1 J. Weinstein & M. Berger, Weinstein's Evidence par. 403[03], at 403-33 (1975) (The meaning of "prejudice").  The admission of Brown's juvenile adjudication records would effect his credibility but would not prejudice him for three reasons: (1) Brown was not a co-defendant in Tabb's case so the admission of his prior adjudication records would not result in his conviction; (2) Tabb was charged with three criminal offenses so Brown's prior juvenile adjudications would not confuse the issues in Tabb's criminal case; and (3) Brown was not a codefendant so his prior adjudication records would not mislead the jury attempting to determine Tabb's guilt or innocence.  Accordingly, since Brown was a witness and would not have been prejudiced by the admission of his juvenile adjudications at Tabb's trial, the trial court erred when it granted the State's  motion *in limine* and excluded Brown's juvenile adjudications because Brown's prior adjudication records would not prevent the jury from deciding Tabb's case on its factual merits.

The majority found that the exclusion of Brown's prior adjudication was a harmless error for two reasons: (1) because the error did not contribute to Tabb's conviction; and (2) because the

other evidence (Gomez's, the victim's, testimony) overwhelmingly supported Tabb's conviction. I disagree with the majority's conclusions. First, the majority is in error when it says that Brown's testimony did not contribute to Tabb's conviction because Brown's testimony corroborated Gomez's testimony. It is my considered opinion that Gomez's testimony was of limited value without Brown's testimony because Gomez testified (1) that he did not see the offender approach his window, and (2) that the encounter with the offender lasted between 5 and 10 seconds. Given the fact that Gomez had a 5- to 10- second encounter with the offender, without Brown's corroboration, Gomez's identification testimony would be questioned by the jury. Second, if Brown's corroborating testimony is impeached and if we are left with Gomez's testimony, we do not have overwhelming evidence of Tabb's guilt because Gomez's identification of Tabb as the shooter was contradicted by Officer Cadichon's identification of Prittard as the shooter and Brown as a second offender. It should be noted (1) that Brown testified that he and Prittard were at the crime scene when Tabb shot Gomez; and (2) that by placing himself and Prittard at the crime scene, Brown's testimony corroborates Officer Cadichon's testimony, in part, because the officer testified that Prittard was the shooter and that Brown was the man in the getaway car. Therefore, if Tabb had been permitted to cross-examine and impeach Brown with any pending cases and with his prior adjudication, I do not think the jury would have convicted Tabb based on Gomez's identification because it was based on a 5- to 10- second encounter with the offender.

## CONCLUSION

In conclusion, I note that the sixth amendment provides: "In all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him ***." U.S.

Const., amend. VI; accord Ill. Const. 1970, art. I, §8 ("In criminal prosecutions, the accused shall have the right *** to be confronted with the witnesses against him or her"). "Confrontation forces the prosecution's witnesses to submit to cross-examination (*California v. Green*, 399 U.S. 149, 158, 26 L. Ed. 2d 489, 497, 90 S. Ct. 1930, 1935 (1970)), 'beyond any doubt the greatest legal engine ever invented for the discovery of truth' (5 J. Wigmore, Evidence §1367, at 32 (Chadbourn rev. ed. 1974))." Accordingly, a criminal defendant's constitutional right to confrontation includes the right to cross-examine. *Douglas v. Alabama*, 380 U.S. 415, 418, 13 L. Ed. 2d 934, 937, 85 S. Ct. 1074, 1076 (1965). *Blue*, 205 Ill. 2d 1 at 12.

I note that " ' [c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested.' " *Blue*, 205 Ill. 2d 1 at 12 , quoting *Davis v. Alaska*, 415 U.S. 308, 316, 39 L. Ed. 2d 347, 353, 94 S. Ct. 1105, 1110 (1974). A cross-examiner has traditionally been allowed to impeach, and discredit witnesses by introducing evidence of prior criminal conviction of that witness to reveal possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues in the case. *Blue*, 205 Ill. 2d at 12-13; *Gonzalez*, 104 Ill. 2d at 337 (the right to cross-examine a witness as to his biases, prejudices or ulterior motives is protected by the federal and state constitutions). In this case, (1) by failing to order the State to produce Brown's juvenile adjudications prior to trial, and (2) by erroneously granting the State's motion *in limine* and denying Tabb the opportunity to cross-examine Brown with his prior juvenile adjudications, Tabb was not permitted to impeach Brown's testimony by establishing his biases, prejudices and ulterior motives for testifying falsely. *Redmond*, 146 Ill. App. 3d at 264; *Stokes*, 121 Ill. App. 3d at 75-76. Accordingly, Tabb was

1-05-1640

denied a fair trial.