2022 IL App (2d) 210198-U
No. 2-21-0198
Order filed September 20, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-944 |
| JAMMAL DRANE, | ) ) ) | Honorable David P. Kliment, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Schostok and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm, concluding (1) the erroneous admission of two hearsay statements made by the child victim, as testified to by her mother, did not prejudice defendant; and (2) by failing to make an offer of proof, defendant forfeited his claim that the trial court erroneously limited his examination of the victim's mother.

¶ 2    A jury convicted defendant, Jammal Drane, of one count of predatory criminal sexual assault (720 ILCS 5/11-1.40(a)(1) (West 2016)), based on an incident in which defendant made contact between his penis and his six-year-old daughter, J.D.'s, hand. The trial court sentenced defendant to eight years' imprisonment. Defendant appeals, raising two contentions. First, he contends the trial court erred by allowing J.D.'s mother to testify to two statements made to her by

J.D., without first finding, under section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2018)), those statements had sufficient safeguards of reliability. Second, he contends the trial court abused its discretion when it refused his request at trial to recross-examine J.D.'s mother. We affirm.

¶ 3                                  I. BACKGROUND

¶ 4                                  A. The Charges

¶ 5      In June 2018, a grand jury indicted defendant on seven counts of predatory criminal sexual assault. The State later dismissed count I of the indictment, which alleged defendant penetrated J.D.'s sex organ with his penis (720 ILCS 5/11-1.40(a)(1) (West 2016)). The remaining counts of the indictment alleged that, between January 1, 2017, and October 6, 2017, defendant rubbed J.D.'s sex organ with his hand (counts II, III, and IV) and placed J.D.'s hand on his penis (counts V, VI, and VII). Counts II through VII were based on six separate acts.

¶ 6                                  B. Pretrial Proceedings

¶ 7      1. *The State Gives Notice of Its Intent to Introduce J.D.'s Outcry Statements*

¶ 8      Before trial, the State gave defendant notice of its intent to introduce, under section 115-10 of the Code, J.D.'s outcry statements to her mother, Aimee J., and investigator Kris Tunney, an Aurora police officer specially trained to interview child sex-crime victims. At a hearing on the admissibility of the statements, the State presented the testimony of Aimee and Tunney and video recordings of two interviews J.D. gave at the Kane County Child Advocacy Center in Geneva, which established the following.[1]

---

[1]Minor details regarding J.D.'s outcry statements have been taken from other parts of the record.

¶ 9     J.D. was born on March 16, 2011, and is defendant's daughter. Defendant and Aimee did not live together and had an informal custody agreement under which J.D. spent every other weekend with defendant.

¶ 10    On October 1, 2017, Aimee picked up J.D. from defendant's apartment in Aurora. On the drive back to their apartment, which they shared with Aimee's mother, Lori J., in Palatine, J.D. stated spontaneously to Aimee, "I hope I don't smell like daddy's [*i.e.*, defendant's,] vagina." Aimee asked J.D. why she would smell like defendant's vagina, and J.D. replied, "because I put baby oil on it." Aimee told J.D. that defendant did not have a vagina and asked J.D. to show her where she put the baby oil. J.D. pointed to her genitals. Aimee asked J.D. if she put the oil on defendant's "private parts," and J.D. responded, "yes." Aimee then asked J.D. whether defendant ever put baby oil on her, and J.D. said, "yes." Aimee asked J.D. to demonstrate, and J.D. rubbed her hand in a circular motion around her vagina. J.D. told Aimee that defendant touched her differently than Aimee did when Aimee bathed or wiped her. J.D. was not upset during this conversation and told Aimee she trusted defendant more than her.

¶ 11    When they arrived home, Aimee's friend, Sally Cheeseman, was in the apartment. Aimee directed J.D. to go inside, while Aimee spoke to Cheeseman outside. Aimee told Cheeseman what happened. Cheeseman replied that, because they were both mandated reporters,[2] one of them had

---

[2]Aimee worked at a daycare center, and Cheeseman was a school social worker. Under the Abused and Neglected Children Reporting Act, child care and education personnel are required to immediately report to the Department of Children and Family Services "when they have reasonable cause to believe that a child known to them in their professional or official capacities may be an abused or neglected child." 325 ILCS 5/4(a)(4), (6) (West 2020).

to call the Department of Children and Family Services (DCFS). Aimee then asked Cheeseman, "can you just come to the hospital with me[?]"

¶ 12    Later that evening, Aimee and J.D. went to Northwest Community Hospital in Arlington Heights, accompanied by Cheeseman. Aimee did not discuss further the incident and instead reassured J.D. that they were going to make sure she was safe. Carrie Buerger, a nurse, examined J.D., collected a sexual assault kit from her, and released her home.

¶ 13    Later that week, Aimee discussed with J.D. the incident after she picked her up from daycare, because she "just wanted to know." She asked J.D. to again show where she had put baby oil on defendant and where he had put it on her. J.D. pointed to her genital area. When they got home, Aimee asked J.D. to demonstrate with a spoon how she put baby oil on defendant, and J.D. "moved her hand up and down on the spoon handle in a circular motion."

¶ 14    On a separate occasion later that week, Aimee put J.D. to bed. Aimee asked J.D. why she did not wear shorts to bed, and J.D. said she did not want to. Aimee asked J.D. what she wore to bed when she visited defendant, and J.D. said she "sometimes *** forgets to put pajamas on so she sleeps naked." J.D. continued that she liked to sleep at defendant's house because defendant slept in bed with her. J.D. also asked Aimee why they did not shower together and told Aimee she showered with defendant.

¶ 15    Though J.D. lived with Lori and Lori was aware of the allegations, Lori was not present for these conversations and did not discuss the allegations with J.D. and Aimee.

¶ 16    On October 6, 2017, Marisol Schroeder, an individual therapist specially trained to interview victims of child-sex crimes, interviewed J.D. at the Child Advocacy Center. During the interview, J.D. identified body parts on drawings of a male and female and indicated she understood it was inappropriate to touch another person's genitals. J.D. did not disclose any sexual

abuse and denied anyone had inappropriately touched her.

¶ 17    After the sexual assault kit was analyzed, on February 22, 2018, Tunney interviewed J.D. at the Child Advocacy Center. During this second interview, J.D. again identified body parts on drawings of a man and a woman, identifying the man's genitals as "private part." Tunney asked J.D. if she knew why she was being interviewed, and J.D. replied, "[bec]ause [she] touched [defendant's] private parts" with her hands. J.D. stated it happened only one time, while they were on his bed in the living room at his home. According to J.D., she was sitting on the bed and defendant was lying next to her. They were watching a movie. Defendant pulled down his pants and underwear and asked J.D., "can you please touch it?" Defendant did not tell her how to touch him but pushed her hand down onto his private part. (Tunney asked J.D. to demonstrate how defendant pushed her hand. Tunney put her hand on the table, and J.D. placed her hand on top of it.) Defendant did not make J.D.'s hand move when she was touching it, and he "stayed still" while she did so. J.D. saw defendant's private part. J.D. said defendant's private part was "large" and "squishy." It "felt weird" and was "soft" when she touched it. It did not change when she touched it, and nothing came out of it. J.D. said "stop" and stopped touching defendant's private part. Defendant said "[o]kay." Defendant did not put anything on his private part before she touched it. Nor did he make J.D. put anything on it. J.D. saw defendant put an ice pack on his private part after she touched it. Defendant told her not to tell anyone what happened, but J.D. told Aimee and, later, her therapist.

¶ 18    Tunney then discussed with J.D. her bedtime routine at defendant's home. Defendant did not help J.D. put on her pajamas, and they slept together on the bed in the living room. Defendant helped her take a bath, washing her with a bar of soap. When it was "too late to take a bath," defendant and J.D. showered together. J.D. would see defendant's private parts when they did so.

He sometimes helped wash her in the shower but never asked J.D. to help wash him.

¶ 19   J.D. understood that no one should touch her "boobies," vagina, or "butt," and she denied that she had "problems with anybody touching any of those parts." She denied defendant touched her private part and denied telling Aimee "maybe that something else happened."

¶ 20   Between the two interviews, J.D. and Aimee began seeing a therapist. They went weekly for six to eight months, then went every other week. Their first couple sessions in therapy were joint sessions, and they later engaged individually. During therapy, the therapist discussed with J.D. and Aimee why they were there and why J.D. was not allowed to see defendant. J.D. and Aimee stopped going to therapy a couple months before September 2019.

¶ 21   During argument, the State clarified that it was seeking to introduce three statements: (1) J.D.'s October 1, 2017, statements to Aimee, after Aimee picked up J.D. from defendant's apartment; (2) J.D.'s statements to Aimee later that week (in the car and at home), during which she again told Aimee where she had touched defendant and where he had touched her and demonstrated how she touched defendant on a spoon; and (3) J.D.'s February 22, 2018, statements to Tunney. The State acknowledged J.D.'s statements to Aimee regarding sleeping naked with defendant and showering with him were "not related to any of the charged acts in this case." Thus, it was "not seeking to admit those for 115-10 purposes at this hearing." The trial court found J.D.'s statements were admissible, provided J.D. was available to testify, finding the statements provided sufficient safeguards of reliability.

¶ 22                              2. *Other Pretrial Litigation*

¶ 23   After the section 115-10 hearing, the parties engaged in additional pretrial motion practice. The State did not seek a ruling *in limine* to admit J.D.'s statements that were not encompassed in

the trial court's section 115-10 ruling, *i.e.*, J.D.'s statements that she sometimes slept naked with defendant and sometimes showered with him or any other statements.

¶ 24                                    C. Trial

¶ 25                                1. *The State's Case*

¶ 26                                    a. Aimee

¶ 27    At trial, Aimee's testimony regarding J.D.'s initial outcry statements to her was mostly consistent with her testimony at the section 115-10 hearing. However, the State asked whether J.D. had said anything about how often defendant rubbed baby oil on J.D. and how often J.D. rubbed it on defendant. Aimee testified J.D. "said it happened every time she goes to [defendant's]." Defendant objected, and during a sidebar, the following exchange occurred:

> "THE COURT: What is the objection?
>
> [Defense counsel]: Judge, my objection is that this was not testimony of the 115-10 hearing.
>
> [The State]: Judge, [Aimee] can't be expected to recall word for word what she said in the 115-10. If there is something significant[,] that could be an issue, but otherwise, I would suggest it is just impeachment.
>
> THE COURT: That is my recollection vaguely of the 115-10 hearing and I'm looking at the order here so I am going to overrule [the] objection."

The State again asked Aimee whether J.D. had said how often this occurred, and Aimee responded that J.D. said it happened every time J.D. was with defendant.

¶ 28    Aimee also testified about J.D.'s statements to her, made later that week in the car and also at their home. Her testimony regarding these statements was consistent with her testimony at the section 115-10 hearing. In addition, the State asked Aimee whether J.D. had made any other

statements to her later that week. Without objection, Aimee testified that, one night when she was putting J.D. to bed, J.D. did not want to wear shorts. Aimee asked J.D. what she wore to bed when she was with defendant, and J.D. said she sometimes slept naked. J.D. then asked Aimee why Aimee did not shower with her, because defendant sometimes showered with her.

¶ 29　Aimee added that, when she picked up J.D. on October 1, 2017, J.D. had just taken a bath and nothing appeared out of the ordinary. Aimee did not pull over when J.D. made these statements. When they arrived home, Aimee directed J.D. to go inside and get ready for bed and later took J.D. to Northwest Community Hospital in Arlington Heights, where she signed a consent to submit J.D. to a sexual-assault examination.

¶ 30　On cross-examination, Aimee testified that she and defendant were in an off-and-on relationship for six or seven years, which finally ended in November 2016. When J.D. was born, Aimee, defendant, J.D., and Lori lived together at Lori's home in Palatine. He moved out later in 2011. Aimee acknowledged that, during her and defendant's relationship, they argued and disagreed, sometimes about J.D. They were also involved in relationships with other people, which was a source of tension until they broke up for good. They also sometimes argued about defendant's visitation with J.D. She nevertheless believed, until J.D.'s outcry, defendant was a good father and wanted him to have time with J.D.

¶ 31　Defense counsel then asked Aimee whether she had "filed a support case against [defendant] in 2012 in Cook County," and Aimee responded that she had. A formal visitation arrangement could have been, but was not, established in those proceedings. Because the visitation arrangement was informal, Aimee was able to cancel J.D.'s visitation with defendant when J.D. had activities, when she and J.D. went out of town, or if Aimee and J.D. had plans together. During

defendant's visitation with J.D., J.D. had access to defendant's phone and could call Aimee if needed. J.D., however, never asked Aimee "to come pick her up because there was a problem."

¶ 32    Aimee acknowledged that she had previously testified (in the section 115-10 hearing) regarding J.D.'s statements, and though she was not specifically asked, she did not previously disclose J.D.'s statement that she and defendant put baby oil on each other "every time" J.D. was with him. Aimee explained that her recollection of that statement was a "new memory" and that she had "tried to block that day out."

¶ 33    Both Aimee and Cheeseman were mandated reporters, but Aimee did not call the police, because she instead took J.D. to the hospital. Aimee never thought to record her conversations with J.D. or have a third person listen to J.D. explain what happened. She did not ask J.D. to demonstrate on a spoon based on her training as a mandated reporter but, rather, because she wanted to know what happened and her primary concern was to protect J.D.

¶ 34    Aimee also testified that, on October 4, 2017, she petitioned for an order of protection under Cook County case No. 12-D-350153 (the Cook County child support case referred to previously in her testimony), seeking an order protecting her and J.D. from defendant. She handwrote the petition and swore to its accuracy. In the petition, Aimee alleged only that defendant had made contact between his penis and J.D.'s hands; Aimee did not allege defendant had touched J.D.'s vagina.

¶ 35    After J.D.'s interview with Schroeder, Aimee and J.D. talked frequently about the incidents. They engaged in near-weekly therapy, sometimes together and sometimes individually. Aimee never told J.D. what to say and did not make her promises or threaten punishment, depending on what J.D. said to others regarding the allegations.

¶ 36    On redirect, the following exchange occurred:

Q. Amiee [*sic*], defense counsel asked you about the topic of child support?

A. Yes.

Q. In 2017, were you receiving child support from the defendant?

A. I don't remember. I got it sometimes and then I didn't.

Q. Did you ever have any reason to believe that if the defendant got in serious legal trouble you would somehow get more child support?

A. No."

Aimee also testified her primary concern when she was asking J.D. about what happened was J.D.'s safety.

¶ 37 At the conclusion of the State's redirect, the trial court directed Aimee to step down from the stand. Defense counsel asked the court to recross-examine Aimee, and the court responded, "No recross."[3] Counsel did not ask the court to hear an offer of proof or otherwise inform the court what she wished to ask Aimee on recross.

¶ 38                                          b. J.D.

¶ 39 J.D., age nine at trial, testified that she lived with Aimee, Lori, and her aunt Linda. When J.D. was six years old, she visited defendant every other weekend at his home.

---

[3]Defendant notes there is an ambiguity in the record. The report of proceedings shows his counsel was transcribed as stating, as opposed to asking, "No recross." Defendant asserts counsel, in fact, asked to recross-examine Aimee, as shown by his inclusion of the issue in his posttrial motion. Because the State does not challenge defendant's assertion, we need not resolve the ambiguity.

¶ 40    J.D. testified that, during her last visit with defendant, which was in October 2017, defendant touched her private parts (which she identified on an anatomical drawing at trial as the female genital area) while she and defendant sat on the bed in the living room. He touched her over her clothes, and his hand was still. J.D. could not recall whether defendant touched her under her clothes. J.D. testified that defendant touched her private part once.

¶ 41    The State then asked J.D. whether defendant had ever had her touch him, and J.D. responded, "yes." J.D. stated her hand touched defendant's head but she did not touch any other part of his body. After J.D. circled the head on an anatomical drawing of a man, the State asked J.D. whether any part of defendant's skin touched her private part, and J.D. replied, "[j]ust the part that I touched." Asked what part of defendant she touched, J.D. testified she touched defendant's private part, and she circled the genital area on the anatomical drawing of a man. J.D. explained that, after her bath, defendant gave her baby oil and told her to put it on his private part. His pants were off. J.D. put the baby oil on defendant's private part, and defendant put baby oil on J.D.'s private part. Defendant told her not to tell anyone.

¶ 42    On cross-examination, J.D. admitted she talked with the State before trial to "practice[ ]" and that she tried to give the answers she had "practiced." She had also discussed what had happened with Aimee and her therapist. J.D. recalled that she was twice interviewed, though she could not remember many details.

¶ 43    Regarding the first interview (with Schroeder), J.D. recalled she was asked whether someone touched her private part, and she responded that no one had. She never told Schroeder that she had put baby oil on defendant's private part. She could not recall whether she told Schroeder that defendant rubbed, put baby oil on, or touched the inside of her vagina, or that defendant touched her differently than did Aimee. Nor could J.D. recall whether she told Schroeder

that she touched defendant's private part "in any way" or whether she demonstrated how she touched defendant's private part.

¶ 44    J.D.'s recollection of the second interview (with Tunney) was even more hazy. Though J.D. "kind of" recalled giving a second interview, J.D. could not remember the name of the person she spoke with, what questions were asked, or what she did and did not tell the person.

¶ 45    On redirect, J.D. made it clear that defendant touched her private part and she touched his private part only once.

¶ 46                            c. Sally Cheeseman

¶ 47    Cheeseman, who had a close relationship with Aimee and had known J.D. her entire life, testified that, on October 1, 2017, she was present at Aimee's apartment when she and J.D. returned from defendant's apartment. When they arrived, Aimee was visibly upset. She spoke with Aimee on the front porch, while J.D. got ready for bed, and she later accompanied Aimee and J.D. to the hospital. Cheeseman did not discuss the allegations with J.D., and J.D. did not spontaneously disclose them to her.

¶ 48                            d. Investigator Tunney

¶ 49    Investigator Tunney laid a foundation for the admission of the video recording of J.D.'s February 22, 2018, interview, which was played for the jury and has been summarized above. On cross-examination, Tunney acknowledged that J.D. was twice interviewed at the Child Advocacy Center, and during the first interview, she did not disclose any inappropriate contact between defendant and her. Tunney agreed that J.D. disclosed to her that she touched defendant's penis only once and never disclosed that he had touched her vagina. J.D. did not mention baby oil during the interview J.D. did not become upset or hostile or seem overwhelmed during the interview.

¶ 50    Tunney also testified that, as part of her investigation, on March 2, 2018, she and other officers executed a search warrant at defendant's apartment. During the search, they obtained from defendant a buccal swab for deoxyribonucleic acid (DNA) analysis and photographed the inside of his apartment.

¶ 51                                    e. Carrie Buerger

¶ 52    Buerger, a specially trained sexual assault nurse examiner, examined J.D. on October 1, 2017. Per her standard practice in cases involving children, she took a history from Aimee outside J.D.'s presence and did not ask J.D. any questions about what occurred. Buerger performed a head-to-toe physical examination of J.D. She observed mild erythema, or redness, both inside and outside J.D.'s vagina, which was the only abnormality she observed in J.D.'s genital area. The erythema was "possibl[y]" consistent with a sexual assault but could also have been caused by riding a bicycle or poor hygiene.

¶ 53    Buerger also took oral, vaginal, and anal swabs from J.D., including two swabs on the exterior of J.D.'s vagina and two swabs from the interior, and a blood sample from J.D.'s finger. Buerger tendered the swabs and blood sample to Aurora police officer Jared Fischer.

¶ 54                                    f. William Anselme

¶ 55    William Anselme, a forensic biologist at the Illinois State Police crime lab, analyzed the swabs for the presence of semen. Anselme explained that semen consists of two components: a liquid portion (*i.e.*, seminal fluid) and a cellular portion (*i.e.*, sperm cells). He combined into a single sample clippings from each of the four swabs collected from J.D.'s vagina. That sample contained prostate specific antigen (PSA), or p30, which is found in seminal fluid but can also be found in other places, including in blood, and can travel throughout the body. He also examined the sample under a microscope but did not find any sperm cells. Thus, he concluded the sample

was "semen indicated," as opposed to "semen identified," which is the finding he makes if sperm cells are detected in a sample. Anselme did not determine which of the four vaginal swabs contained PSA. (In other words, he did not determine whether the PSA was present internally or externally.)

¶ 56                                    g. Kelly Krajnik

¶ 57    Kelly Krajnik, a forensic scientist at the Illinois State Police crime lab, analyzed for DNA the sexual assault kit and defendant's buccal swab. Krajnik explained she can perform two types of DNA analysis: autosomal DNA testing and Y-STR testing. Autosomal DNA testing is preferred because it can better distinguish between two people. Y-STR testing is less discriminate and specifically targets the Y chromosome, which is found only in men. Y-STR testing is best utilized when there is a small amount of male DNA mixed within a large amount of female DNA. Krajnik further explained that men receive their Y chromosomes from their fathers, and, typically, a father passes the same Y-STR profile to his sons.

¶ 58    Krajnik performed Y-STR testing in this case, because the swabs from the sexual assault kit did not contain enough male DNA to perform autosomal testing. Krajnik obtained defendant's Y-STR profile from his buccal swab and compared it to a Y-STR profile that she identified in the sample from the vaginal swabs. She determined that the profile "matche[d] the Y-STR haplotype of [defendant]," meaning defendant was "included as a contributor" in the sample. She explained the identified Y-STR profile would be expected to occur in approximately 1 in 2000 unrelated black men, 1 in 1500 unrelated Hispanic men, and 1 in 2400 unrelated white men. (Defendant is black.)

¶ 59    Krajnik acknowledged that "not a ton of [male] biological material" was identified in the analysis she performed, but it was nevertheless sufficient to perform her analysis. She could not

determine how the male DNA she identified was deposited onto the samples collected from J.D. and agreed that it could have been deposited through transfer, as opposed to direct contact with biological material. However, even direct contact with biological material could result in a low level of DNA being recovered. Krajnik agreed that, hypothetically, biological material could be transferred onto a person if that person handled a towel into which another person ejaculated.

¶ 60                                    g. Defendant's Driving Abstract

¶ 61    The State also introduced a certified copy of defendant's driving abstract, which established defendant was born February 19, 1986, meaning he was more than 17 years old when the charged conduct occurred.

¶ 62    The State rested.

¶ 63                            2. *Defendant's Motion for a Directed Finding*

¶ 64    Defendant moved for a directed verdict, arguing, in part, that the State failed to prove defendant engaged in multiple acts of hand-to-vagina and penis-to-hand contact, given J.D.'s clear testimony that each act occurred only once. Thus, he argued he was entitled to a directed verdict (at least) on counts II, III, VI, and VII. The court granted his motion as to those counts, leaving only counts II (hand-to-vagina contact) and V (penis-to-hand contact) remaining.

¶ 65                                    3. *Defendant's Case*

¶ 66                            a. Marisol Schroeder and J.D.'s First Interview

¶ 67    Defendant first called Marisol Schroeder, who laid a foundation for the admission of the recording of J.D.'s October 6, 2017, statements to her. The recording was played for the jury. As noted above, J.D. did not disclose any inappropriate contact between her and defendant.

¶ 68                                    b. Karl Reich

¶ 69    Defendant's controlled expert witness, a forensic biologist and DNA analyst, Karl Reich, testified that he reviewed the forensic analysis performed by the crime lab. He first addressed the presence of p30 in the vaginal swab. Reich explained p30 is found in other bodily fluids, including male blood and, "[o]nce in a while," female urine. He acknowledged, however, that p30 is most highly concentrated in seminal fluid. Nevertheless, because no sperm cells were observed in the sample, Anselme's conclusion, based on the presence of p30, that "semen [was] indicated" on the vaginal swabs, was factually incorrect. According to Reich,

> "The factual[ly] correct answer would be [p]30 identified. And then if you wanted to, you could say [p]30 is a protein that is found in high amounts in seminal fluid. That's the precise description of the result.
>
> Illinois State Police has their interpretation guidelines[,] which they developed, and so they allow themselves to say 'semen indicated' when the [p]30 test is positive but the sperm search is negative."

¶ 70    Reich did not dispute Krajnik's conclusion that the vaginal swab contained male DNA from which defendant could not be excluded as a contributor but explained no one could answer how or when the DNA was deposited or transferred to J.D. According to Reich, DNA can be deposited or transferred through direct contact, *i.e.*, by touching or if bodily fluid contacts another. It can also be transferred when the source touches an object that is later touched by another. (Reich testified it was possible for even more remote contact to transfer DNA.) The amount of DNA reduces each time biological material is transferred from one source to another. Hypothetically, if a person handled or used a towel that had another's semen on it, then transfer of DNA to the person would be likely. Additionally, DNA from the semen on that towel could be transferred to a bed sheet and then to another person.

¶ 71    Reich further testified that one ejaculate can contain 50 or 100 million sperm cells. Only .2 nanograms, *i.e.*, less than a billionth of a gram, or about 40 cells worth, of DNA was recovered from the vaginal swab sample.

¶ 72    Reich opined that, because the amount of DNA that was recovered was so small, it was possible the DNA was transferred by some means other than direct contact. And because no semen was identified (*i.e.*, no seminal fluid plus sperm cells), no one could be sure of the body fluid source of the Y-STR profile. According to Reich, "those two facts are coupled in the inability to definitively define how it got there or what it was from to begin with."

¶ 73    On cross-examination, Reich testified that it was possible that seminal fluid could be deposited without sperm cells, for example, if it was deposited by an aspermic man or one with a low sperm count. He also acknowledged that at least one publication has stated the beginning of an ejaculation contains fewer sperm cells than the middle or end. He agreed that DNA analysis cannot answer how or when DNA was deposited or transferred.

¶ 74                                   4. *The Jury's Verdict*

¶ 75    The jury found defendant guilty of count V (penis-to-hand contact) and not guilty of count II (hand-to-vagina contact).

¶ 76                           D. Posttrial Motion and Sentencing

¶ 77    Defendant moved for a judgment notwithstanding the verdict or, in the alternative, a new trial. In part, he asserted the trial court erred when it permitted, over his objection, Aimee to testify about J.D.'s statement to her that the conduct at issue occurred "every time" J.D. was with defendant. Defendant contended this statement was not presented at the section 115-10 hearing and the court did not make the required finding with regard to that statement. Defendant did not raise any issue with Aimee's testimony about J.D.'s statements to her that J.D. sometimes

showered with defendant and slept naked at his house. Defendant also contended the court erred by refusing defendant's request to recross-examine Aimee, though he never identified what he would have discussed or what he expected Aimee's testimony to be.

¶ 78    The court denied defendant's motion and sentenced defendant to 10 years' imprisonment. Defendant filed a "motion for reconsideration" that asked the court to reconsider both the denial of his posttrial motion and his sentence. The court granted in part the motion, reducing defendant's sentence to eight years, and this appeal followed.

¶ 79                                II. ANALYSIS

¶ 80    On appeal, defendant contends the trial court erred when it (1) permitted Aimee to testify to two of J.D.'s statements to her that were not found reliable under section 115-10 of the Code, and (2) refused to allow defendant to recross-examine Aimee after the State elicited two new matters in its redirect examination.

¶ 81                        A. Section 115-10 of the Code

¶ 82    Defendant first contends the trial court erred when it permitted Aimee to testify regarding two statements made by J.D. without first finding them sufficiently reliable under section 115-10 of the Code. Specifically, defendant takes issue with two hearsay statements elicited during Aimee's testimony: J.D.'s statements that (1) the inappropriate touching occurred "every time" she stayed with defendant, and (2) she sometimes showered with defendant and slept naked at his house. According to defendant, he did not have prior notice of J.D.'s statement regarding the frequency with which the touching occurred, the trial court did not make a finding of reliability as to either statement, and the statements were not otherwise admissible under another exception to the hearsay rule.

¶ 83    Before beginning our discussion, we note that defendant properly preserved his claim with respect to the first statement ("every time"), but, as he acknowledges, he forfeited his claim with respect to the second statement (sleeping naked and showering), because he failed to object at trial and raise the issue in his posttrial motion. Defendant asks that we review the admission of the second statement for plain error. Thus, we must first determine, with respect to both statements, whether error occurred. See *People v. Eppinger*, 2013 IL 114121, ¶ 19 (noting the first step in plain-error analysis is to determine whether error occurred).

¶ 84                1. *Section 115-10 of the Code and the Standard of Review*

¶ 85    Section 115-10 of the Code is a statutory exception to the hearsay rule that is applicable in prosecutions for, among others, sex crimes against young or disabled victims. The impetus behind section 115-10 was the concern "that 'child witnesses, especially the very young, often lack the cognitive or language skills to effectively communicate instances of abuse at trial [citation], or may be impeded psychologically in their efforts to do so.' " (Alteration in original.) *People v. Boling*, 2014 IL App (4th) 120634, ¶ 83 (quoting *People v. Bowen*, 183 Ill. 2d 103, 115 (1998)).

¶ 86    Relevant here, section 115-10 permits "testimony of an out[-]of[-]court statement made by the victim describing any complaint of such act or matter or detail pertaining to any act which is an element of the offense which is the subject of a prosecution for a sexual or physical act against that victim." 725 ILCS 5/115-10(a)(2) (West 2018). However, such testimony is not admissible unless (1) the trial court first finds, in a hearing conducted outside the jury's presence, "that the time, content, and circumstances of the statement provide sufficient safeguards of reliability"; (2) the victim testifies at the proceeding or is unavailable and there is evidence to corroborate the act which is the subject of the statement; and (3) in cases involving a child under age 13, the out-of-court statement was made before the victim attained 13 years of age or within 3 months after

the commission of the offense, whichever is later. *Id.* § 115-10(b). Further, "[t]he proponent of the statement shall give the adverse party reasonable notice of his [or her] intention to offer the statement *and the particulars of the statement*." (Emphasis added.) *Id.* § 115-10(d).

¶ 87    A trial court's decision to admit a hearsay statement under section 115-10 will not be disturbed absent an abuse of discretion. *People v. Burgund*, 2016 IL App (5th) 130119, ¶ 242. An abuse of discretion occurs when the court's decision is unreasonable. *Id.* ¶ 255.

¶ 88                    2. *The Trial Court Erred By Admitting Both Statements*

¶ 89    We agree with defendant that it was error to admit both statements. We begin by noting the State provided defendant written notice that it intended to introduce some of J.D.'s statements under section 115-10. However, the written notice provided only dates of those statements and did not specify the particulars of the statements. See 725 ILCS 5/115-10(d) (West 2018). Thus, defendant was on notice that the State intended to offer, under section 115-10, only what was presented at the section 115-10 hearing.

¶ 90    We first address Aimee's testimony regarding J.D.'s statement that the conduct occurred "every time" defendant visited with J.D. At the section 115-10 hearing, Aimee never testified that J.D. told her anything about the frequency with which the abuse occurred. Indeed, the State never asked the question. Thus, there were two problems with the admission of this statement under section 115-10. First, the plain language of section 115-10 requires the proponent of the evidence to give the adverse party "reasonable notice of his [or her] intention to offer the statement *and the particulars of the statement*." (Emphasis added.) 725 ILCS 5/115-10(d) (West 2018). Here, the State did not give notice of this particular aspect of J.D.'s statement to Aimee, because it was not disclosed in writing or at the section 115-10 hearing. Second, because that particular statement was not presented to the trial court, the court necessarily could not have made the requisite finding

"that the time, content, and circumstances of the statement provide[d] sufficient safeguards of reliability." *Id.* § 115-10(b). Accordingly, there was no basis to admit this aspect of J.D.'s statement under section 115-10 of the Code.

¶ 91    On this point, we strongly disagree with the State's characterization of the first statement as an "ancillary comment." That comment was not ancillary and directly bore on defendant's guilt on counts II through VII of the indictment, which, as noted, alleged defendant committed six separate acts. Had the court not directed a verdict in defendant's favor on counts III, IV, VI, and VII, Aimee's testimony would have been the sole basis on which to find defendant guilty of those counts, given J.D.'s clear testimony that each act occurred only once.

¶ 92    We likewise conclude that there was no basis to admit the second statement—that J.D. sometimes slept naked and showered with defendant—under section 115-10. Admittedly, Aimee testified to J.D.'s statement at the section 115-10 hearing. But the State later clarified that it was not seeking admission of the statement under section 115-10, noting those acts were "not related to any of the charged acts in this case." And because the State clarified it was not seeking admission of that statement under section 115-10, the trial court necessarily did not make the requisite finding. See *id.*

¶ 93    Because neither statement was admissible under section 115-10, we must determine whether either statement was admissible on some other basis. The State asserts both statements were admissible, under section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2018)), to show defendant's propensity to commit the charged acts. It further asserts that the first statement was admissible other-crimes evidence, under the common-law rule, to show defendant's intent, design, or course of conduct, and to corroborate J.D.'s testimony concerning the charged offense. See *People v. Illgen*, 145 Ill. 2d 353, 364-65 (1991).

¶ 94    In pertinent part, section 115-7.3 provides that, when a defendant is accused of committing certain sex offenses, including predatory criminal sexual assault against a child, evidence of his commission of other sex offenses "may be admissible (*if that evidence is otherwise admissible under the rules of evidence*) and may be considered for its bearing on any matter to which it is relevant." (Emphasis added.) 725 ILCS 5/115-7.3(b) (West 2018). However, before admitting the evidence, the court must find the other-crimes evidence is relevant and, after considering the proximity in time and factual similarity to the charged offense and any other relevant facts and circumstances, its probative value outweighs its prejudicial effect. *Id.* § 115-7.3(c).

¶ 95    Evidence of other crimes may also be admissible when it is relevant to prove a defendant's *modus operandi*, intent, identity, motive, or absence of mistake. *Illgen*, 145 Ill. 2d at 364-65. And "in sexual offense cases[,] evidence of a defendant's prior sexual activity with the same child is admissible to show the defendant's intent, design[,] or course of conduct and to corroborate the victim's testimony concerning the charged offense." *People v. Anderson*, 225 Ill. App. 3d 636, 647 (1992). Other-crimes evidence must not be barred by another rule of evidence, such as the hearsay rule. *People v. Kinnett*, 287 Ill. App. 3d 709, 715 (1997). And when such evidence is offered, the trial court must weigh its probative value against its prejudicial effect, and it may exclude the evidence if the prejudicial effect substantially outweighs its probative value. *Illgen*, 145 Ill. 2d at 365.

¶ 96    The State argues that both statements at issue were admissible to show defendant's propensity under section 115-7.3 and that the "every time" statement was also admissible to show defendant's intent, design, or course of conduct, and to corroborate J.D.'s testimony concerning the charged offense. We disagree.

¶ 97    The State overlooks the requirement that evidence of other crimes, offered for any purpose, must otherwise be admissible. See 725 ILCS 5/115-7.3(b) (West 2018); *Kinnett*, 287 Ill. App. 3d at 715. The statements at issue were clearly hearsay, as they were J.D.'s out-of-court statements to Aimee and were offered for their truth. Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Those statements were, therefore, not admissible as other-crimes evidence unless some exception to the hearsay rule applied. *Kinnett*, 287 Ill. App. 3d at 715. On appeal, the State offers no exception to the hearsay rule under which the statements at issue were admissible, and we will not conjure an argument on its behalf. *People v. Sophanavong*, 2020 IL 124337, ¶ 21 (the doctrine of forfeiture applies equally to the State). Further, because the State never offered the statements at issue to prove defendant's propensity or for a common-law purpose, the trial court was never given the opportunity to weigh the probative value of those statements against their prejudicial effect. *Illgen*, 145 Ill. 2d at 365. Accordingly, we conclude it was error to admit both statements.

¶ 98    3. *The Admission of the Statements Did Not Prejudice Defendant*

¶ 99    We must next determine whether the admission of the statements prejudiced defendant, thus, requiring a new trial. As noted, defendant preserved his argument with respect to the first statement but forfeited his argument with respect to the second. Accordingly, our process for making this determination for each statement, while similar, has a significant difference: the State has the burden to show admission of the first statement was harmless, while defendant has the burden, under the plain-error rule, to show admission of the second statement was prejudicial. See *People v. Thurow*, 203 Ill. 2d 352, 363 (2003) (explaining the distinction between harmless-error analysis, which applies when an error is preserved, and plain-error analysis, which applies when an error is forfeited).

¶ 100   To prove an error was harmless, the State must establish "there is no reasonable probability that the jury would have acquitted the defendant absent the error." (Internal quotation marks and alterations omitted.) *People v. Stull*, 2014 IL App (4th) 120704, ¶ 104.

¶ 101   To obtain relief under the plain-error rule, a defendant must demonstrate he or she was prejudiced by the error and can do so by establishing (1) the evidence at trial was so closely balanced that admission of the statements alone threatened to tip the scales against defendant (first prong); or (2) the admission of the statements was so serious that it affected the fairness of defendant's trial and challenged the integrity of the judicial process (second prong). *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007). Defendant urges for relief under the first prong. When determining whether a defendant has met his or her burden under the first prong, we perform a qualitative (not quantitative), commonsense, and contextual analysis of the totality of the evidence. *People v. Belknap*, 2014 IL 117094, ¶¶ 50, 53.

¶ 102   Defendant contends that the evidence of his guilt was close and, therefore, under both the harmless-error standard and the first prong of the plain-error rule, he is entitled to a new trial. Defendant argues that, because the forensic analysis of the vaginal swab did not conclusively establish the presence of semen, the presence of defendant's DNA, or how or when the biological material was deposited, the determination of his guilt came down to the credibility of J.D. and Aimee.

¶ 103   Initially, we note the jury found defendant guilty on count V (penis-to-hand contact) and not guilty on count II (hand-to-vagina contact). To sustain count V, the State was required to prove that defendant committed an act of contact, however slight, between his penis and J.D.'s hand, for the purpose of sexual gratification or arousal of J.D. or him, and that defendant was 17 years or

older and J.D. was younger than 13 years at the time of the offense. 720 ILCS 5/11-1.40(a)(1) (West 2016).

¶ 104  We conclude the evidence at trial overwhelmingly established defendant's guilt such that there is no reasonable probability the jury would have acquitted defendant had that statement not been admitted or that the admission of the statements threatened to tip the scales against defendant. At trial, J.D. testified that, the last time she saw defendant, after her bath, she put baby oil on defendant's "private part" and defendant put baby oil on her vagina. She and defendant were on defendant's bed, and his pants were off. J.D. was clear that this happened only once, and she testified defendant told her not to tell anyone.

¶ 105  J.D.'s trial testimony was consistent with her initial outcry statements, as recounted by Aimee at trial. When Aimee picked up J.D. from defendant's apartment, J.D. spontaneously said to Aimee that she hoped she did not smell like defendant's "vagina." When Aimee inquired with J.D., J.D. told her that she put baby oil on defendant's private part and that defendant put baby oil on her vagina. She also told Aimee that she trusted defendant more than her. Later that week, but before Schroeder interviewed J.D., J.D. again told Aimee that she had touched defendant's private part.

¶ 106  Admittedly, as defendant points out, J.D.'s statements were not entirely consistent from her initial outcry through trial. Indeed, J.D. did not disclose any inappropriate contact to Schroeder. And J.D. told Tunney only that she touched defendant's private part, made no mention of baby oil, and provided additional detail to Tunney that she did not disclose at trial.

¶ 107  However, other than her interview with Schroeder, J.D. consistently stated that she touched defendant's penis at his request, which was the count on which the jury convicted him. And defendant omits entirely from his discussion the context in which J.D. gave each of her accounts.

When viewed in context, it is not surprising that J.D.'s statements to her mother and her testimony at trial differed from the statements she gave to Schroeder and Tunney. See *Boling*, 2014 IL App (4th) 120634, ¶ 83 (noting that young child witnesses often lack the cognitive or language skills to effectively communicate instances of abuse or may be impeded psychologically in their efforts to do so). J.D. was only six years old when she made each of her pretrial statements, and she had been told by defendant, her father, not to tell anyone about what had happened. She spontaneously made the initial statements, in the privacy of a car, to her mother, Aimee, with whom she was undoubtedly comfortable. Less than a week later, she again disclosed inappropriate contact, though this time it was not spontaneous but rather in response to Aimee's question. Days later, she was taken to an unfamiliar place and interviewed by Schroeder, a stranger, and did not disclose any inappropriate contact. Then, after she had engaged in months of therapy, during which she discussed why she could no longer see defendant, she was interviewed by Tunney, another stranger, and this time disclosed that she touched defendant's penis at his request and gave descriptive details of what happened, using age-appropriate language. By the time of trial, J.D. had aged approximately three years and, though she initially testified that she touched defendant's head, she corrected herself that she also touched defendant's penis. Under these circumstances, the inconsistencies to which defendant points did not render J.D.'s consistent statements that she touched defendant's penis at his request incapable of belief.

¶ 108   Moreover, defendant offers nothing to show J.D. was not an otherwise credible witness and little to support his theory that Aimee conjured the allegations or coached J.D. to do so. Admittedly, Aimee testified there was tension in her and defendant's off-and-on relationship, which lasted until they permanently broke up in November 2016, and she only sometimes received child support from defendant. However, nothing in the record suggests that this tension motivated

Aimee, almost one year later, to inculpate defendant. Nor does anything suggest that defendant's occasional failure to support J.D. motivated Aimee or was a source of tension or disagreement. To the contrary, Aimee testified that, until J.D.'s outcry, she believed defendant was a good father to J.D. and wanted J.D. to have time with him. To conclude that Aimee had a motive to falsely incriminate defendant would require a factfinder to speculate.

¶ 109    Further, the physical evidence tended to corroborate J.D.'s statements that inappropriate touching occurred. We note the State does not rely on the physical evidence in its discussion of prejudice, and we acknowledge the physical evidence may not have been definitive. Indeed, it did not establish when, how, or where (internally or externally) the biological material found on J.D.'s vaginal swab was deposited. Nor did it definitively establish defendant was the source of the biological material or that sexual abuse was the cause of the abnormal physical examination. Nevertheless, the erythema Buerger observed on J.D.'s vagina was consistent with sexual abuse. And, as defendant's expert even acknowledged, PSA, or p30, is most highly concentrated in seminal fluid, thus increasing the likelihood, notwithstanding the absence of sperm cells, that seminal fluid was the biological material, linked to defendant through DNA analysis, found in the vaginal swabs. Though, arguably, the physical evidence was not inconsistent with defendant's theory that defendant's DNA was transferred to J.D.'s vaginal area via a towel or their shared bedding, the jury was free to reject that theory.

¶ 110    Defendant also maintains that Aimee's testimony regarding J.D.'s "every time" statement bolstered her credibility instead of "letting the jury weigh [her] credibility based on the properly-admitted statements." Further, he notes, the State mentioned Aimee's testimony regarding this statement in its rebuttal argument at trial and "was one of the last things the jury was reminded of

before deliberation." And we note the jury twice heard Aimee testify to that statement, as the State asked her again the question again after the sidebar.

¶ 111    Nevertheless, defendant fails to offer any argument as to how Aimee's testimony bolstered J.D.'s credibility in this regard, and we fail to see how it could have, given that statement conflicted with J.D.'s trial testimony that each act occurred only *once* and her statement to Tunney that she touched defendant's penis only *once*. Moreover, in light of J.D.'s clear testimony on this point, we fail to see how Aimee's repetition of this statement at trial and the State's brief, isolated reference to the statement in its rebuttal argument could have contributed to defendant's conviction.

¶ 112    Defendant essentially asks us to view the two aspects of the State's case—J.D.'s statements and testimony and the physical evidence—separately and points to weaknesses in each to support his position that the errors were prejudicial. Viewing the evidence as a whole, however, we conclude the evidence overwhelmingly established defendant's guilt such that there is no reasonable probability that a jury would have acquitted defendant had the "every time" statement not been admitted. *Stull*, 2014 IL App (4th) 120704, ¶ 104.

¶ 113    For these same reasons, we conclude the admission of the second statement did not threaten to tip the scales against defendant. Indeed, as we have discussed, the evidence in this case—J.D.'s consistent testimony, initial outcry, and statements to Tunney that she touched defendant's penis at his request and the physical evidence, which was corroborative of J.D.'s statements—overwhelmingly established defendant's guilt on count V. Thus, defendant cannot meet his burden under the first prong of the plain-error rule.

¶ 114    In sum, we conclude it was error to admit both of J.D.'s statements. Nevertheless, the State has established defendant was not prejudiced by admission of the first statement, and defendant has failed to establish he was prejudiced by admission of the second statement.

¶ 115                          B. Recross-Examination of Aimee

¶ 116   Defendant next contends the trial court abused its discretion by refusing his request to recross-examine Aimee. He asserts the State elicited new evidence on its redirect of Aimee: (1) she sometimes received child support from defendant in 2017, and (2) the reason why she did not record J.D.'s statements and did not immediately call the police but instead filed for an emergency order of protection was her concern for J.D.'s safety. Thus, he argues, he was entitled to further explore these areas on recross-examination, and the court's refusal prejudiced him. Further, citing *People v. Garner*, 2018 IL App (5th) 150236, defendant argues the record shows the trial court had a blanket policy of denying his recross-examination of any witness, which was itself an abuse of discretion.

¶ 117                             1. *Standard of Review*

¶ 118   Like all evidentiary rulings, " 'the scope and extent of cross-examination and recross-examination are within the discretion of the [trial] court.' " *People v. Graves*, 2012 IL App (4th) 110536, ¶ 16 (quoting *Adams v. Sarah Bush Lincoln Health Center*, 369 Ill. App. 3d 988, 998 (2007)). Thus, we will reverse the trial court's refusal of recross-examination only if the trial court abused its discretion. *Id.* An abuse of discretion occurs when the trial court's ruling is unreasonable. *People v. DePaolo*, 317 Ill. App. 3d 301, 308 (2000). We will affirm the court's limitation of inquiry "unless the defendant can show his or her inquiry is not based on a remote or uncertain theory." *People v. Tabb*, 374 Ill. App. 3d 680, 689 (2007).

¶ 119                    2. *The Trial Court Did Not Adopt a Blanket Policy*

                              *of Disallowing any Recross-examination*

¶ 120   We first examine defendant's contention that the trial court had a blanket policy of disallowing recross-examination, which was itself an abuse of discretion. In support of his

contention, he relies primarily on *Garner*. *Garner* involved a prosecution for unlawful possession of a firearm by a felon. *Garner*, 2018 IL App (5th) 150236, ¶ 3. The firearm was recovered by a police officer who saw the defendant throw the firearm while he was pursuing the defendant on foot. *Id.* ¶ 6. In his cross-examination of the officer, the defendant elicited testimony that the officer submitted evidence for forensic testing but the officer did not know whether that testing had, in fact, been performed. *Id.* ¶ 7. On redirect, the State elicited from the officer that the state crime lab, as a matter of policy, did not perform DNA analysis on firearms and introduced into evidence a written policy to that effect. *Id.* ¶ 8. After the State finished its redirect, the trial court asked the officer to step down from the stand and the State to call its next witness. *Id.* ¶ 9. Defense counsel interjected, asking, "No opportunity to [re]cross?" *Id.* The court responded, "That's right. You had an opportunity to cross. You cross-examined him. Then it's redirect. That's the way it works ***. [The] State gets last shot at a witness when they are their witness." *Id.*

¶ 121 On appeal, the defendant argued the trial court's refusal to permit recross-examination as a blanket policy constituted prejudicial error and denied him a fair trial. *Id.* ¶ 16. The appellate court agreed, noting the record established that the trial court had a blanket policy of disallowing recross-examination. *Id.* ¶ 19. The appellate court emphasized the trial court's comments in response to the defendant's request for further inquiry, noting there was no rule that the examination of witnesses follows a direct-cross-redirect pattern or that the State gets the final opportunity to question its witnesses. *Id.* The court thus found the trial court failed to exercise any discretion at all, which was itself an abuse of discretion. *Id.* ¶ 20.

¶ 122 In reaching its decision, the court in *Garner* rejected the State's argument that the defendant forfeited review of the issue by failing to make an offer of proof as to what the officer may have said on recross-examination and by failing to include the issue in his posttrial motion. *Id.* ¶ 16-17.

The court, however, reviewed the purported error under the plain-error doctrine, finding the blanket ban on recross-examination "affected the entire trial and undermined [the court's] sense of fairness in the proceeding." *Id.* ¶ 17.

¶ 123   Admittedly, some of the facts here are similar to those in *Garner*. As in *Garner*, the trial court rebuked defendant's request to recross-examine the State's first witness and defendant did not thereafter ask to recross-examine any other witness. We nevertheless find *Garner* distinguishable. Unlike in *Garner*, the record here does not support a finding that the trial court had a blanket policy of disallowing recross-examination of any witness.

¶ 124   In *Garner*, after it rebuked the defendant's request, the trial court commented, "You had an opportunity to cross. You cross-examined him. Then it's redirect. That's the way it works ***. [The] State gets last shot at a witness when they are their witness." *Id.* ¶ 9. These comments demonstrated the court's decision was based on its misapprehension or erroneous belief that recross-examination was never proper or that the State was entitled to have the final opportunity to question its witnesses. And the court's comments made it clear that, as a matter of policy, the court would disallow the recross-examination of any witness.

¶ 125   Here, when the court refused defendant's request to recross-examine Aimee, the court made no such comments, and at no time did the court demonstrate that its refusal of defendant's request was based on a misapprehension or erroneous belief that recross-examination was never proper. Defendant acknowledges he never asked the trial court to recross-examine any of the State's other witnesses. But he asserts the trial court's " 'fairly forceful' " refusal of his request to recross-examine Aimee demonstrates any such request would have been refused. See *id.* ¶ 25 (the trial court's "fairly forceful" refusal to allow recross-examination explained the defendant's failure to attempt recross-examination of any other witness). We are not persuaded. The record here does

not establish the trial court's refusal of defendant's request to recross-examine Aimee was "fairly forceful," and there is no indication that a request to recross-examine any other witness would have been futile. Simply put, the court's refusal of defendant's *only* request to recross-examine a witness is not, without more, enough to support a finding that the court had a blanket no-recross-examination policy.

¶ 126    3. *Defendant's Failure to Make an Offer of Proof Precludes Review of this Claim*

¶ 127    Generally, when a trial court limits cross-examination, the aggrieved party must make an offer of proof to preserve the issue. See *People v. Peeples*, 155 Ill. 2d 422, 457 (1993); *Tabb*, 374 Ill. App. 3d at 689. A formal offer of proof is preferred, but an informal offer may be sufficient to preserve the error, provided counsel's summary of what the proposed evidence might prove is specific and not based on speculation or conjecture. *Id.* The offer of proof must at least "establish on the record that the evidence was directly and positively related to the issue of bias or motive to testify falsely." *Id.*

¶ 128    Our supreme court has explained that an offer of proof serves two primary purposes. *People v. Thompkins*, 181 Ill. 2d 1, 10 (1998). First, it discloses to the trial judge and opposing counsel the nature of the offered evidence and enables them to take appropriate action. *Id.* Second, it provides the reviewing court with a record to determine whether exclusion of the evidence was erroneous and prejudicial. *Id.* " 'An adequate offer of proof is the key to preserving a trial court's error in excluding evidence,' " because only then can a reviewing court know what evidence was excluded and determine whether the exclusion was proper. *People v. Bowman*, 2012 IL App (1st) 102010, ¶ 34 (quoting *Thompkins*, 181 Ill. 2d at 10). Thus, "[t]he failure to make an adequate offer of proof forfeits the issue on appeal." *Id.*

¶ 129    We conclude defendant forfeited review of this contention by failing to make any offer of proof as to what evidence his recross-examination of Aimee would have established. Because defendant failed to make an offer of proof, we have no basis on which to conclude the trial court wrongfully refused defendant the opportunity to recross-examine Aimee. Indeed, we would be left to speculate as to what evidence would have been elicited, whether that evidence would have been admissible, and whether it would have assisted the jury in its determination of defendant's guilt. See *People v. Pelo*, 404 Ill. App. 3d 839, 877 (2010), *abrogated on other grounds*, *People v. Veach*, 2017 IL 120649. It was defendant's burden to preserve his claim of error and to present a record to support his claim, and his failure to make an offer of proof has deprived this court of an adequate record to review his claim. See *id.* Accordingly, we must honor his forfeiture.

¶ 130    In reaching this conclusion, we reject defendant's argument that the trial court did not afford defendant the opportunity to make an offer of proof. Defendant posits, "Had the trial court allowed defense counsel to provide an offer of proof, or given the defense an opportunity to pose questions it would ask on recross, then perhaps the trial court could have properly exercised its discretion on whether to permit further examination." The record provides no support for defendant's assertion that the court refused him the opportunity to make an offer of proof. Rather, it shows defendant never even asked to do so, and it does not show such a request would have been futile.

¶ 131    We acknowledge that, in *Garner*, the court rejected the State's argument that the defendant forfeited his claim of error, in part, by failing to make an offer of proof. (The defendant also failed to raise the issue in his posttrial motion.) In rejecting the State's argument, the court concluded the error at issue—the blanket disallowance of *any* recross-examination—"affected the entire trial and undermine[d the court's] sense of fairness in the proceeding." *Garner*, 2018 IL App (5th) 150236,

¶ 17. Here, we are unable to say that the trial court's denial of defendant's request to recross-examine one witness affected the entire trial or has undermined our confidence in the fairness of the proceeding.

¶ 132                                III. CONCLUSION

¶ 133   For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 134   Affirmed.